**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**CLIFFORD P. BEEDE, SHERRY E. HALLIGAN,**
**EILEEN MOTTL, and CATHERINE G. WEEKS,**

**Plaintiffs/Counter Defendants,**

vs.                                                                    **1:13-cv-120**
                                                                         **(MAD/RFT)**

**STIEFEL LABORATORIES, INC., CHARLES**
**W. STIEFEL, BRENT D. STIEFEL, TODD**
**STEIFEL, STEPHEN KARASICK, MICHAEL**
**CORNELIUS, and MATT S. PATTULLO,**

**Defendants/Counter Claimants.**

_____

**APPEARANCES:**                                         **OF COUNSEL:**

**FREEMAN HOWARD, PC**                          **MATTHEW J. GRIESEMER, ESQ.**
441 East Allen Street                                         **PAUL M. FREEMAN, ESQ.**
P.O. Box 1328
Hudson, New York 12534
Attorneys for Plaintiffs/Counter
Defendants


**GREENBERG TRAURIG LLP**                   **DAVID COULSON, ESQ.**
333 SE 2nd Avenue                                           **HILARIE BASS, ESQ.**
Miami, Florida 33131                                        **LINDSEY EDELMANN, ESQ.**
Attorneys for Defendants/Counter              **TODD D. WOZNIAK, ESQ.**
Claimants                                                            **CYNTHIA E. NEIDL, ESQ.**

**SCHOEMAN, UPDIKE, KAUFMAN &**       **BETH L. KAUFMAN, ESQ.**
**STERN, LLP**                                                  **PAULETTE J. MORGAN, ESQ.**
551 Fifth Avenue
New York, New York 10176
Attorneys for Defendants/Counter
Claimants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On January 13, 2013, Plaintiffs commenced this federal question action alleging securities fraud, breach of fiduciary duty and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Dkt. No. 1. Pursuant to a stipulation of partial voluntary dismissal dated January 21, 2015, Plaintiffs dismissed the following counts: (1) Count 2 alleging violations of ERISA Section 404 (29 U.S.C. § 1104); (2) Count 3 alleging violations of ERISA Section 405(a) (29 U.S.C. § 1105(a)); and (3) Count 4 alleging violations of ERISA Sections 406, 408 (29 U.S.C. §§ 1106, 1108)). *See* Dkt. No. 78. As a result of the stipulation of voluntary dismissal, Plaintiffs' only remaining claim is one for securities fraud pursuant to 15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934 against Defendants Stiefel Laboratories, Inc. ("Stiefel Labs" or "SLI") and Charles Stiefel. *See id.*; *see also* Dkt. No. 1 at ¶¶ 125-144.

Currently before the Court are the following motions: (1) Plaintiffs' motion for partial summary judgment on Defendants' counter claims (Dkt. No. 65); (2) Defendants' motion for partial summary judgment against Plaintiffs Beede, Halligan, and Weeks (Dkt. No. 67-1); (3) Plaintiffs' motion for summary judgment (Dkt. Nos. 81-85); (4) Plaintiffs' *Daubert* motion to exclude and preclude the testimony of Defendants' purported experts, Lance T. Studdard and Chester Gougis (Dkt. No. 86); and (5) Defendants' motion *in limine* to exclude the expert testimony of Daniel Reser (Dkt. No. 89).[1]

---

[1] Although there are currently five pending motions before the Court, this Memorandum-

## II. BACKGROUND

**A.    The parties**

Defendant Stiefel Labs is a Delaware Corporation with its principal place for the transaction of business located at 20 TW Alexander Drive, Research Triable Park in the State of North Carolina. *See* Dkt. No. 85 at ¶ 1. Prior to July 22, 2009, Stiefel Labs owned and maintained a manufacturing facility in the Hamlet of Oak Hill, Town of Durham, County of Greene and State of New York. *See id.* at ¶ 2. On April 20, 2009, British Company GlaxoSmithKline, PLC ("GSK") executed an initial agreement to acquire Stiefel Labs, and the acquisition closed on July 22, 2009. *See id.* at ¶ 3. Stiefel Labs is now an affiliate and wholly-owned subsidiary of GSK. *See id.* at ¶ 4.

Prior to its acquisition by GSK, Stiefel Labs was the world's largest independent pharmaceutical company specializing in dermatology with annual sales at its peak of over $900 million and thousands of employees. *See id.* at ¶ 5. Defendant Stiefel Labs had been privately held, owned in large part by the Stiefel family, for its entire 162-year history, until it merged with GSK in 2009. *See id.* at ¶ 6; *but see* Dkt. No. 101 at ¶ 6.

Prior to Stiefel Labs' acquisition by GSK, Defendant Charles W. Stiefel served as Stiefel Labs' Chief Executive Officer, Chairman of the Board of Directors, a member of the Board's

---

[1](...continued)
Decision and Order will only address (1) Plaintiffs' motion for partial summary judgment on Defendants' counter claims (Dkt. No. 65); and (2) Defendants' motion for partial summary judgment against Plaintiffs Beede, Halligan, and Weeks (Dkt. No. 67-1). These motions both pertain to Defendants' counterclaims against Plaintiffs and do not address Plaintiffs' underlying claims of securities fraud brought pursuant to 15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934 against Defendants. The remaining motions will be addressed in a forthcoming Memorandum-Decision and Order. The Court has included as part of the factual background the information pertaining to the unaddressed motion for summary judgment to provide the complete procedural and factual context giving rise to the present action.

compensation and executive committees, and had control over various aspects of Stiefel Labs. *See id.* at ¶ 8. At the time of the merger with GSK, Defendant Charles Stiefel owned approximately 10% of Stiefel Labs' outstanding common stock, and 90% of its Class B shares, which empowered him to appoint six of the nine directors to SLI's Board. *See id.* at 9.

Prior to SLI's acquisition by GSK, Brent Stiefel served as SLI's Executive Vice President, a member of the Board of Directors, and was a member of the Board's compensation and executive committees. *See id.* at ¶ 10. Prior to SLI's merger with GSK, Todd Stiefel served as SLI's Executive Vice President of Global Strategy, a member of the Board of Directors, and was a member of the Board's compensation and executive committees. *See id.* at ¶ 11. Moreover, prior to the merger, Stephen Karasick served as SLI's Senior Vice President of People and Technology, while Michael Cornelius served as SLI's Chief Financial Officer and Matt S. Pattullo served as SLI's Senior Vice President and Human Resources. *See id.* at ¶¶ 12-14.

Until his termination from employment, Plaintiff Clifford Beede was employed by Defendant SLI and then by GSK at Oak Hill for more than thirty (30) years, most recently serving as Senior Scientist. *See* Dkt. No. 85 at ¶ 15. Plaintiff Beede was terminated as an employee of GSK on June 28, 2011. *See id.* at ¶16.

Until her termination from employment, Plaintiff Sherry Halligan was employed by SLI and then by GSK at Oak Hill for more than twenty-three (23) years, most recently serving as a Senior Associate. *See id.* at ¶ 17. Plaintiff Halligan was terminated as an employee of GSK on December 7, 2011. *See id.* at ¶ 18.

Until her termination from employment, Plaintiff Eileen Mottl was employed by SLI and then by GSK at Oak Hill for more than thirteen (13) years, most recently serving as Scientist.

*See id.* at ¶ 19.  Plaintiff Mottl was terminated as an employee of GSK in July of 2012.  *See id.* at ¶ 20.

Until her termination from employment, Plaintiff Catherine Weeks was employed by SLI and then by GSK at Oak Hill for twenty-six (26) years, most recently serving as a personal Grade 8 Employee.  *See id.* at ¶ 21.  Plaintiff Weeks was terminated as an employee on December 30, 2011.  *See id.* at ¶ 22.


**B.      The Blackstone Transaction**

On July 31, 2007, Blackstone Healthcare Partners, LLC ("Blackstone") made an offer to purchase an interest in SLI.  *See* Dkt. No. 84-1 at Ex. 95.  On August 7, 2007, Defendant Charles Stiefel consented to a transaction with Blackstone for an investment of $500,000,000 by Blackstone where Blackstone would acquire new convertible preferred shares of SLI.  *See id.*; *but see* Dkt. No. 101 at ¶ 24.  On August 9, 2007, Defendant Charles Stiefel announced the Blackstone Transaction to SLI employees.  *See* Dkt. No. 84-1, Ex. 98.  In the email announcing the transaction, Defendant Charles Stiefel stated as follows: "Stiefel will continue to be a privately held company operating under my direction as Chairman, Chief Executive Officer, and President.  The Stiefel family will continue to hold a majority-share ownership in the company.  Blackstone will be a minority investor in Stiefel Laboratories and have one seat on the company's board of directors."  *Id.*  Charles Stiefel also stated in a Frequently Asked Questions attachment that "[t]here are currently no plans for Stiefel to become a publicly traded company.  Blackstone will have a defined exit arrangement with Stiefel at the end of eight years."  Dkt. No. 84-1, Ex. 98 at SLI-8-000724.

**C.      The SLI Employee Stock Bonus Plan ("ESBP")**

SLI established an Employee Stock Bonus Plan ("ESBP" or the "Plan") in 1975, through

which the company annually provided shares of SLI common stock and/or cash to its employees

as part of their compensation and for their retirement.  *See* Dkt. No. 85 at ¶ 27.  The ESBP was

managed by a Trustee and a Plan Committee.  *See id.* at ¶ 28.  Pursuant to Section 9.1 of the Plan

titled "The Committee," the terms of the Plan provided the Committee with the following

powers:

> The exclusive responsibility and authority to control and manage
> the operation and administration of the Plan, except to the extent
> such responsibility and authority are otherwise specifically (i)
> allocated to the Disability Review Board, the Company or the
> Trustee under the Plan or the Trust Agreement, (ii) delegated to
> other persons by the Committee or (iii) allocated to other parties by
> operation of law, shall be vested in the Committee.  The
> Committee also shall be the "plan administrator" within the
> meaning of ERISA.

Dkt. No. 85 at ¶ 28.

Defendant Charles Stiefel served as the Plan Trustee from August 13, 2001 until October

22, 2008.  *See id.* at ¶ 29.  He also served on the ESBP Committee during the time he served as

Plan Trustee.  *See id.*  Stephen Karasick replaced Charles Stiefel as successor Trustee to the Plan

on October 20, 2008.  *See id.* at ¶ 30; *see also* Dkt. No. 84-1, Ex. 38 at SLI-2-000487-488.

Charles Stiefel continued to serve on the ESBP Committee and continued as CEO of SLI after

Stephen Karasick became Trustee to the Plan.  *See id.*

Between 2000 and 2008, Stiefel Labs contributed both shares of stock and cash into their

employees ESBP accounts.  *See* Dkt. No. 83-3 at 12-16.  In 2008, SLI contributed only cash to

the ESBP.  *See id.* at 13.  Employees of SLI were sent annual valuation statements of their ESBP

6

account, which would include the value of the shares. *See id.* at 12-16. Every year, Stiefel Labs hired an independent appraiser to appraise the value of company shares. *See id.* at 14. When an employee would put his shares back to the company, SLI was required to pay the appraised value of the stock. *See id.* SLI's fiscal year ends on March 31, and the appraised value of the company shares would not be available until sometime in October or November. *See id.* Participants in the Plan were unable to get a distribution from their account until SLI received the appraised value of the company shares. *See id.* at 15.

The price per share of the ESBP was typically announced by Charles Stiefel in an email to all United States employees of Stiefel Labs. *See* Dkt. No. 85 at ¶ 32. The appraiser who set the stock price in 2008 was named Terrence Bogush of the firm Bogush & Grady, LLP. *See id.* at ¶ 33; *see also* Dkt. No. 83-3 at 14, 31. On August 31, 2008, Mr. Bogush issued his report valuing the ESBP shares as of March 31, 2008 in the amount of $16,469 per share. *See id.* at ¶ 34. On October 14, 2008, Defendant Charles Stiefel announced to SLI employees the share price for the ESBP of $16,469 per share. *See id.* at ¶ 35.

The Plan provided certain "put" rights to its participants. *See id.* at ¶ 36. Pursuant to § 7.6 of the Plan, titled "Option to Have Company Purchase Bonus Stock," a qualifying participant "shall have the right to require the Company to purchase the Bonus Stock for its current fair market value (as determined pursuant to Treas. Reg. Section 54.4975-11(d)(5)." *Id.* Prior to November 2008, an eligible Plan participant could, upon the occurrence of a "qualifying event" as set forth in Section 7 of the Plan, request a distribution of the stock held in their ESBP account under the terms of the ESBP. *See id.* at ¶ 37; *see also* Dkt. No. 84-1, Ex. 32 at SLI-2-000199. Qualifying events included death, termination of employment, or retirement. *See id.*

On April 17, 2008, Defendant Charles Stiefel agreed to amend the Plan to merge the 401(k) with the ESBP and to limit the windows for participants to elect diversification (the "First Plan Amendment"). *See* Dkt. No. 85 at ¶ 38; Dkt. No. 84-1, Ex. 102 at SLI-11-018497. On May 29, 2008, the SLI Board of Directors approved the First Plan Amendment, effective June 1, 2008. *See id.* at ¶ 39;[2] Dkt. No. 84-1, Ex. 32 at SLI-2-000226.

On September 26, 2008, the Company made a second amendment to the Plan, effective October 1, 2008, that would "give the Committee the discretion to grant additional diversification rights under the Plan[.]" Dkt. No. 85 at ¶ 40. The Second Plan Amendment added a new Section 7.13 to the Plan, which read as follows:

> The Committee may, in addition to the diversification rights provided under Section 7.12 in accordance with Code Section 401(a)(28), permit Participants to elect, in such amounts and upon such other terms and conditions as the Committee may establish from time to time in its sole discretion, to invest their Bonus Stock Account in one or more investment options designated by the Committee (other than Bonus Stock). The Committee may, to the extent it deems necessary or appropriate to comply with any applicable limits or otherwise, apply any diversification limits or rights established under this Section on a pro-rata or other reasonable nondiscriminatory basis.

*Id.* For the first time in SLI history, the Second Plan Amendment afforded eligible Plan participants (those who had vested) a new opportunity called "optional diversification" that

---

[2] In their response to Plaintiffs' statement of material facts, "Defendants object to this statement on the ground that it is not supported by the evidence cited." Dkt. No. 101 at ¶ 39. Upon review of the record cited, it is clear that Plaintiffs' statement is in fact supported by the evidence cited. *See* Dkt. No. 84-1, Ex. 32 at SLI-2-000226-000228. Defendants have repeatedly objected to statements of fact on this ground, yet provide no citation to the record in support of their objection, in violation of Local Rule 7.1(a)(3). Rule 7.1 specifically provides that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

allowed eligible participants to elect a distribution of the stock held in the ESBP accounts without a qualifying event. *See id.* at ¶ 41.

On October 29, 2008, Defendant Charles Stiefel emailed all SLI employees with the opening line "'[i]t was the best of times, it was the worst of times,' wrote Charles Dickens, and it seems that this applies pretty well to the current success of Stiefel amidst the immense economic challenges grabbing media headlines." *Id.* at ¶ 42.[3] Charles Stiefel further stated that SLI is "very healthy right now" and that it is "only prudent for us to take measured steps to protect our future while continuing to invest and grow in our company. . . . I look forward to . . . working with each of you to make sure that the next three years are as successful and responsible as the past three." *Id.* On November 19, 2008, Defendant Charles Stiefel emailed employees announcing a temporary austerity program and noted that "our future continues to look extremely bright." *Id.* at ¶ 43.

On November 19, 2008, Gary Jellum released an email communication to SLI employees and Plan participants encouraging them to review "vitally important and time sensitive information" relating to the merger of the 401(k) and the ESBP and a new Optional Diversification opportunity to give employees "more control, flexibility, and opportunity." *Id.* at ¶ 44. Mr. Jellum's email explained that, "for the first time ever," Plan participants would have an opportunity to request diversification of all or a portion of the Company stock in the ESBP accounts. *See id.* at ¶ 45. On November 21, 2008, Mr. Jellum sent a packet to all ESBP

---

[3] Again, "Defendants object to the first sentence in this paragraph because it is not supported by a citation to record evidence required by Local Rule 7.1(a)(3)." Dkt. No. 101 at ¶ 42. Following the second sentence in this paragraph, Plaintiffs provided a citation to record evidence that supports both the first and second sentence of this numbered paragraph. *See* Dkt. No. 85 at ¶ 42.

participants announcing to employees that the shares of Company stock selected to diversify will be sold to the Company based on the most recent stock price of $16,469 per share. *See id.* at ¶ 46. Mr. Jellum stated in his communication that "Stiefel is providing employees with a broad array of investment options for long-term financial security and ensuring that employees have greater flexibility and access to their ESBP account." *Id.* Mr. Jellum also announced that the first diversification window would be open from February 1, 2009 through March 1, 2009, and expressly cautioned that "[d]iversification requests will be pro-rated based on all requests and available funds." *Id.*

On December 19, 2008, Mr. Jellum announced to Plan participants that the diversification window would be moved up to January 12, 2009 through February 2, 2009 to "maximize fulfillment potential." *Id.* at ¶ 47. On January 2, 2009, packets were mailed to ESBP participants eligible for optional diversification with a cover letter stating that the window to submit a diversification request is from January 12, 2009 through February 2, 2009. *See id.* at ¶ 48. Participants were also notified and expressly warned that

> [a]ll requests made during the diversification window will be reviewed at the end of the diversification period. This is done to ensure that the total amount requested doesn't exceed the amount available for diversification. There is always a possibility that diversification requests cannot be fulfilled or that they will be fulfilled at some percentage of what was requested. If the requests exceed the limits available, all participants who submitted diversification requests will be notified of the reduced or denied election.

*Id.* at ¶ 49.

On January 11, 2009, Defendant Charles Stiefel allocated $10,000,000 for the purpose of undertaking ESBP share repurchases, which included $2,000,000 earmarked specifically for

Optional Diversification share buy-backs. *See id.* at ¶ 50.[4] On January 27, 2009, Gary Jellum emailed ESBP participants eligible for optional diversification notifying that diversification requests must be received by February 2, 2009. *See id.* at ¶ 51. Additionally, Plan participants were forewarned as follows: "Please be mindful diversification of company stock may be limited within a plan year. Therefore, there is always a possibility that diversification requests cannot be fulfilled or that they will be fulfilled at some percentage of what was requested. Any reduction is proportionately applied across all requests." *Id.*

On November 26, 2008, the day before Thanksgiving and five days after optional diversification was first announced to SLI employees, Charles W. Stiefel, Brent Stiefel and Todd Stiefel held their annual family meeting to discuss SLI. *See* Dkt. No. 85 at ¶ 52; Dkt. No. 94, Ex. 110. Following the meeting Charles W. Stiefel emailed Anjan Mukherjee at Blackstone to ask about "a concept that has always been taboo in the past – the concept of selling the company." *Id.* Charles W. Stiefel asked Anjan Mukherjee what kind of price SLI would command. *See id.*

At 7:43pm on November 26, 2008, Charles Stiefel emailed Brent Stiefel and Todd Stiefel following a phone call with Anjan Mukherjee at Blackstone stating that Blackstone advised that SLI should be sold "right now or wait 5 years." Dkt. No. 85 at ¶ 53. Blackstone further advised that the price Blackstone paid for its shares in 2007 ($60,407) would "serve as a floor." *Id.* Charles Stiefel also notes that Blackstone "think[s] that it is possible that we could get someone to pay 3-5 times sales." *Id.* At that time, annual sales at SLI were $907,574,139. *See id.* At

---

[4] The Court notes Defendants' objection to this statement and direct their attention to the material Plaintiffs have cited, which fully supports their assertion. *See* Dkt. No. 85 at ¶ 50 (citations omitted).

7:49pm, Brent Stiefel emailed Todd Stiefel and Charles Stiefel and stated, "I vote we move on this right now as 5 years poses a fair amount of risk. . . . I am excited by this proposition. Could you imagine getting 4-5 times sales?" *Id.* at ¶ 54. Charles Stiefel responded to Brent Stiefel and Todd Stiefel and stated "it would be awesome." *Id.* At 7:57pm on November 26, 2008, Charles Stiefel emailed Chinh Chu and Anjan Mukherjee at Blackstone to inform them that Todd Stiefel, Brent Stiefel and Charles Stiefel are "ready to move forward exactly as you suggest." *Id.* at ¶ 55. Charles Stiefel stated, "I forgot to mention one other factor that caused us to consider selling now. I fear that the Obama administration will move to increase the tax rate on capital gains, so selling before that happens would result in considerably more after-tax dollars." *Id.* At 8:08pm on November 26, 2008, Todd Stiefel emailed Charles Stiefel and Brent Stiefel and stated, with respect to the sale of the company, "I agree with BD [Brent Stiefel]. Let's start moving." *Id.* at ¶ 56.

On December 8, 2008, Blackstone prepared and sent Charles W. Stiefel discussion materials for a meeting between Blackstone and SLI about a sales process. Dkt. No. 85 at ¶ 57. In the discussion materials, Blackstone indicated that it understands that SLI has begun to consider a potential change-of-control transaction. *Id.* Blackstone estimated that the time to sign a definitive agreement with an acquiror is three-to-four months. *See id.* Blackstone also included a timeline which estimated that SLI will receive final bids, select a bidder and announce the transaction by March 17, 2009. *See id.* The discussion materials include a tier of potential buyers including Tier I (large cap dermatology) Sanofi Aventis and Tier II (large cap pharma) GSK. *See id.* As a valuation consideration, Blackstone indicated precedent specialty

pharmaceutical transactions have historically been completed at an average last twelve months (LTM) revenue multiple of 3.6x. *See id.*

On December 8, 2008, after discussing figures sent by Blackstone with sale price ranges from $2.25 to $4 billion, Brent D. Stiefel stated in an e-mail with Anjan Mukerjee of Blackstone and Charles W. Stiefel that "to me, we have a lot to offer and anything below $3 billion would seem like we are selling at bargain prices." *Id.* at ¶ 58. Brent D. Stiefel reiterated in his deposition that he agrees that his belief at that time was that $3 billion was a "floor" sales price. *See id.* He also testified that he never relayed this information to Stephen Karasick or to Terrence Bogush. *See id.* Further, Brent Stiefel affirmed that in January and February of 2009, he would never have agreed to sell SLI to an possible acquiror for $16,469 per share, the value SLI used to purchase ESBP stock, because that price was too low. *See id.*[5]

On December 22, 2008, Charles Stiefel emailed Todd Stiefel and Brent Stiefel regarding a meeting he had with Chris Viehbacher, CEO of Sanofi-Aventis that day. *See* Dkt. No. 85 at ¶ 59. Charles states that Chris Viehbacher would be interested in exploring a purchase of SLI.

---

[5] Defendants again object to the last statement of this paragraph "because it misrepresents Brent Stiefel's testimony and contains an improper valuation comparison." Dkt. No. 101 at ¶ 58. During his deposition testimony, Brent Stiefel was asked the following question and provided the following answer:

> Q. Would you have considered selling the company for $16,469 a share during that window?
>
> A. I believe that's the same question you just asked me in a different way. And the answer is no because there would have been no money at all for any shareholders outside of Blackstone and there would have been some money for our bankers, and everybody else would have received zero.

Dkt. No. 83-1 at 7.

Charles Stiefel stated that he was "excited to move forward." *Id.* On the same day, December 22, 2008, Todd Stiefel, Brent Stiefel and Charles Stiefel re-named the sales process "Project Jump," which was previously referred to as "Project Knox." *Id.* On December 29, 2008, Todd Stiefel sent an email to Brent and Charles Stiefel suggesting that they use the code name "Jupiter" when referring to SLI for the Project Jump sales process "because we are about the biggest derm company money can buy! It also implies they will have to pay a jumbo price tag." *Id.* at ¶ 60.

On January ,1 2009, SLI, through Defendant Charles Stiefel, retained Blackstone to "provide financial advisory services to the Company in connection with a Transaction and [to] assist the Company in analyzing, structuring, negotiating and effecting the Transaction[.]" Dkt. No. 94, Ex. 121 at BX-Stiefel 0018358-0018364. Effective on the same day, three-year employment contracts were awarded by the Compensation Committee to several SLI executives, including Charles, Brent and Todd Stiefel. *See* Dkt. No. 94, Exs. 146-148.

On January 11, 2009, Charles Stiefel, acting in his capacity as CEO of SLI, approved Stephen Karasick's request to allocate $2,000,000 for use in buying back employee stock under Optional Diversification. *See* Dkt. No. 85 at ¶ 62. On January 21, 2009, Charles Stiefel signed a confidentiality agreement with Sanofi-Aventis regarding information transmitted pertaining to a potential purchase of Stiefel. *See id.* at ¶ 65; Dkt. No. 95, Ex. 205. On January 29, 2009, Charles Stiefel signed a confidentiality agreement with Johnson & Johnson regarding information transmitted pertaining to a potential purchase of Stiefel. *See id.* at ¶ 66; Dkt. No. 94, Ex. 230.

Plaintiffs Beede, Halligan, Mottle and Weeks were all SLI employees and Plan participants with vested shares in the Plan at the time of SLI's first-ever Optional Diversification period in early 2009. *See* Dkt. No. 85 at ¶ 67. Unaware of Project Jump, on or about January 25, 2009, Plaintiff Mottle requested diversification of 1.765627 of her shares of ESBP stock. *See id.* at ¶ 68. Also unaware of Project Jump, on or about January 26, 2009, Plaintiff Weeks requested diversification of 14.837672 of her shares of ESBP stock. *See id.* at ¶ 70. Unaware of Project Jump, on or about January 28, 2009, Plaintiff Beede requested diversification of 19 of his shares of ESBP stock. *See id.* at ¶ 72. On or about January 29, 2009, also unaware of Project Jump, Plaintiff Halligan requested diversification of 3 of her shares of ESBP stock. *See id.* at ¶ 74.

On January 30, 2009, Matt Pattullo emailed Stephen Karasick and Michael Cornelius and recommended satisfying up to 100% of the additional requests for optional diversification, which totaled approximately $5.4 million, with the total for distributions and diversifications at $13 million. *See* Dkt. No. 85 at ¶ 76; Dkt. No. 101 at ¶ 76; Dkt. No. 94, Ex. 69 at SLI-18-0046. On January 30, 2009, Charles Stiefel, as CEO of SLI, agreed to settle all Optional Diversification requests and emailed Stephen Karasick approving the allocation of an additional sum of money, bringing the total up to approximately $14,000,000 to settle all diversification requests. *See id.* at ¶ 78; Dkt. No. 94, Ex. 40 at SLI-18-0038–0041. Also on January 30, 2009, Michael Cornelius emailed Todd Stiefel that the recommendation to max out all requests is "caveated due to jump" but could not let Matt Pattullo or Stephen Karasick know because they were unaware of Project Jump at the time. *See id.* at ¶ 80; Dkt. No. 101 at ¶ 80. Michael Cornelius asked if Todd Stiefel would get approval from Charles Stiefel to max out and accept

all requests for optional diversifications.  *See id.*  As of February 2, 2009, Charles Stiefel, Tood

Stiefel, Brent Stiefel, Bill Humphries, Gavin Corcoran, Michael Cornelius, Robin Vandekreeke,

Martin Floreani, Devin Buckley, Stephen Karasick and Matt Pattullo knew about Project Jump.

*See id.* at ¶ 81.

On February 3, 2009, Charles W. Stiefel signed a confidentiality agreement with

Allergan pertaining to any information regarding its potential purchase of SLI.  *See id.* at ¶ 82.

On February 5, 2009, Charles Stiefel emailed Brent Stiefel and Todd Stiefel about

increasing his compensation and stated:

> I don't think we should do this at this time because of Project Jump.
> It would look really bad to have my 2 sons award me a whole
> bunch of additional stock right before a sale of the company at a
> stock price many times the price used to calculate my stock.  This
> might be a windfall for me, but none of us need or want the
> potential scrutiny or maybe even lawsuits.

Dkt. No. 85 at ¶ 83.

On February 5, 2009 at 4:36pm, Charles Stiefel responded to an email request to put a

communication plan in place regarding Project Jump in the event there is a public "leak," and he

wrote: (1) "not announce anything to our employees and unnecessarily scare them unless and

until we enter into a binding contract;" (2) "If someone hears a rumor and inquires about it, we

respond: a) companies have been expressing interest in acquiring us for decades. b) we like

being private and independent. c) If a company makes a compelling offer, however, we have a

fiduciary duty to our shareholders to at least listen to the offer. d) In 162 years of business, no

one has yet made an offer that the family wanted to accept."  *Id.* at ¶ 84.

On February 6, 2009, Todd Stiefel provided "tiers" of candidates for Project Jump and

stated that the top candidates for Project Jump include Sanofi-Aventis and GSK, the ultimate

purchaser. *See id.* at ¶ 85. On February 10, 2009, at the request of Brent Stiefel, Whit Knier from Blackstone emailed Brent Stiefel a copy of the latest timeline and work plan prepared by Blackstone which shows: (a) initial bids to be received by mid-March; and (b) the expected execution of a definitive agreement with selected acquiror in April of 2009. *See* Dkt. No. 85 at ¶ 86.

On February 12, 2009, Matt Pattullo emailed the "final tally" for the ESBP changes. *See id.* at ¶ 87. Pattullo noted a "5.1% reduction in outstanding shares and a 31.4% reduction in ESBP holdings." *Id.* On February 13, 2009, Charles Stiefel emailed Todd Stiefel and Brent Stiefel and stated that by mid-May 2009, "[h]opefully, by then, we will either have closed or be just awaiting FTC approval." *Id.* at ¶ 88.

On February 13, 2009, Todd Stiefel emailed all that knew about Project Jump providing the following "Rumor Response":

> We have heard that there is a rumor in the banking community that Stiefel is for sale. If you are asked about anyone in banking, derm or our company, here is the response you should give:
>
> > -blow it off as if it is not an issue or as if it is plain silly
> >
> > - say there are [sic] have been such rumors for really as long as we can remember
> >
> > - say that there is probably just confusion because we are shopping around a bunch of pipeline projects that are not core focuses for us that we gained in the Barrier acquisition and that we are also shopping around some current brands that are not a commercial focus.

Dkt. No. 85 at ¶ 89. Todd Stiefel continued by saying that, "if push comes to shove . . . flatly deny if necessary." *Id.*

On or about February 13, 2009, Plaintiff Beede received $16,469 per share of the 19 shares of ESBP stock from SLI for which he requested optional diversification from SLI. *See id.* at ¶ 90. On or about February 13, 2009, Plaintiff Halligan received $16,469 per share of the 3 shares of ESBP stock from SLI for which she requested optional diversification from SLI. *See id.* at ¶ 91. On or about February 13, 2009, Plaintiff Mottl received $16,469 per share of the 1.765627 shares of ESBP stock from SLI for which she requested optional diversification from SLI. *See id.* at ¶ 92. On or about February 13, 2009, Plaintiff Weeks received $16,469 per share of the 7 shares of ESBP stock from SLI for which she requested optional diversification from SLI. *See id.* at ¶ 93.

On February 14, 2009, one day after the payments were made to ESBP participants who elected optional diversification, Brent Stiefel prepared a payout schedule showing how much money Charles, Brent and Todd Stiefel, and Brent and Todd's children could receive as a result of the sale of the company. *See id.* at ¶ 94.[6] On February 17, 2009, Brent Stiefel emailed representatives at Blackstone asking for the latest timeline. *See id.* at ¶ 96. Blackstone provided the timeline, and Brent forwarded it to Todd Stiefel and Charles Stiefel confirming that the sale process is still on schedule." *Id.* With the exception of a one-month delay, the sales process schedule remained consistent throughout Project Jump. *See id.*

On February 18, 2009, Brent Stiefel emailed Todd Stiefel and Charles Stiefel with an updated payout schedule of what Charles Stiefel, Brent Stiefel and Todd Stiefel will receive as a result of a sale of the company. *See* Dkt. No. 85 at ¶ 97. Again, the payout schedule specifically

---

[6] The Court notes that Defendants assert that this "chart was created to determine at what price point Blackstone's veto right would be eliminated." Dkt. No. 101 at ¶ 94.

included as a potential sales price $3.5 billion. *See id.* On February 20, 2009, Brent Stiefel calculated and sent to Todd Stiefel and Charles Stiefel a third version of the payout schedule showing the difference between what Charles, Todd and Brent Stiefel as well as Todd and Brent Stiefels' children will receive pre-ESBP buyback and post-ESBP buyback on a spreadsheet with a per share price of $68,000 per share. *See id.* at ¶ 98. Brent Stiefel stated that "[i]t is nice to see the $ go up for all of us!" *Id.* On the same day, February 20, 2009, Brent Stiefel emailed those who knew about Project Jump with a "cover story" to use "if we get questions or push-back." *Id.* at ¶ 99.

Following management presentations attended by Charles Stiefel, Bill Humphries, Todd Stiefel, Brent Stiefel, Gavin Corcoran, Mike Cornelius and Devin Buckley on behalf of SLI and GSK and Sanofi-Aventis held on February 17, 2009, on March 12, 2009, Blackstone submitted acquisition proposals to GSK and Sanofi-Aventis, bids being due March 24, 2009. *See id.* at ¶ 100; Dkt. No. 94, Exs. 136-137, 225.

On March 19, 2009, SLI executives became aware of a Wall Street Journal Article expected to come out on March 20, 2009, announcing that SLI is for sale. *See* Dkt. No. 85 at ¶ 101; Dkt. No. 94, Ex. 185. In an email exchange on March 19, 2009, involving a Wall Street Journal article expected to come out on March 20, 2009 announcing that SLI is considering selling itself, Todd Stiefel noted that "[o]ur employees will be getting calls from random friends, and again we want them all to have heard from us beforehand so that they are not blindsided." Dkt. No. 85 at ¶ 102. On March 20, 2009, Wall Street Journal announced that SLI was considering selling itself. *See id.* at ¶ 103.

On March 24, 2009, Sanofi-Aventis submitted a proposal to acquire Stiefel Labs for an enterprise value of $3.2 billion, while GSK submitted a proposal to acquire Stiefel Labs for an enterprise value of $3.5 billion. *See id.* at ¶ 104. On April 16, 2009, GSK submitted a proposal to acquire Stiefel Labs for value up to $3.6 billion. *See id.* at ¶ 105.

On April 20, 2009, for the first time, Charles Stiefel announced to employees, including Plaintiffs, that SLI has agreed to be acquired by GSK in a cash transaction valued at up to $3.6 billion expected to be completed within six (6) months upon United States and European Union regulatory approval. *See* Dkt. No. 85 at ¶ 106. On December 16, 2009, SLI updated its March 31, 2009 ESBP stock valuation from $16,469 per share to $48,402 per share. *See id.* at ¶ 107.

On January 13, 2013, Plaintiffs commenced this federal question action alleging securities fraud, breach of fiduciary duty and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Dkt. No. 1. Pursuant to a stipulation of partial voluntary dismissal dated January 21, 2015, Plaintiffs dismissed the following counts: (1) Court 2 alleging violations of ERISA Section 404 (29 U.S.C. § 1104); (2) Count 3 alleging violations of ERISA Section 405(a) (29 U.S.C. § 1105(a)); and (3) Count 4 alleging violations of ERISA Sections 406, 408 (29 U.S.C. §§ 1106, 1108)). *See* Dkt. No. 78. As a result of the stipulation of voluntary dismissal, Plaintiffs' only remaining claim is one for securities fraud pursuant to 15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934 against Defendants Stiefel Laboratories, Inc. ("Stiefel Labs" or "SLI") and Charles Stiefel. *See id.*; *see also* Dkt. No. 1 at ¶¶ 125-144.

## C.    Plaintiffs' terminations

On or about January 1, 2001, GSK issued and had in place a Health and Welfare Benefits Plan for U.S. employees ("Health and Welfare Benefits Plan" or "HWBP").  *See* Dkt. No. 65-1 at ¶ 16.  Part of the HWBP included a Severance Pay Plan, in effect in 2011 and 2012, that contained provisions relating to the termination and subsequent payment of severance payments to GSK employees.  *See id.* at ¶ 17.  Upon termination from GSK, as part of the Severance Pay Plan, a terminated employee would receive a severance benefits package which contained, among other documents, a general release.  *See id.* at ¶ 18.  In particular, the GSK Severance Pay Plan addressed the issuance of the General Releases sent to employees terminated from GSK, and expressly included a provision permitting the modification of the general release to suit the particular circumstances of each employee's termination.  *See id.* at ¶ 19.  Specifically, GSK's Severance Pay Plan provides as follows:

> General Release
> If an employee is eligible to receive severance pay benefits under the Plan, he/she will be asked to complete a General Release form settling all existing and potential claims against GlaxoSmithKline and all other affiliated companies. . . .  The General Release is subject to amendment and modification to suit the particular circumstances and requirements of each employee terminating employment.  GlaxoSmithKline reserves the right to amend the General Release at any time.

*Id.* at ¶ 20.  In 2011 and 2012, the GSK Severance Pay Plan was distributed and available to all GSK employees through an intranet portal maintained by GSK that contained a copy of GSK's Severance Pay Plan and other important GSK human resources documents.  *See id.* at ¶ 21.

In or about the Fall of 2007, GSK began a reduction in workforce and termination of a number of GSK employees that lasted for approximately five years.  *See id.* at ¶ 22.  In

21

connection with the termination of employees, GSK regularly prepared, sent and processed severance packets to terminated employees. *See id.* at ¶ 23. In the fall of 2007 and continuing to 2012, GSK had only two employees, Gwen Ubil and Harry Bowers, who were responsible for the administration of severance packets for terminated employees in GSK's Philadelphia, Pennsylvania office. *See id.* at ¶ 24. Due to the large volume of new severance packets arising from the reduction

in work force, GSK could not handle the preparation and processing of severance packets for terminated employees on its own. Thus, on or about December 10, 2008, GSK hired Towers Perrin (now Towers Watson) ("Towers Watson"), a professional services firm located in Philadelphia, Pennsylvania, to act on behalf of GSK. *See id.* at ¶ 25; *but see* Dkt. No. 73-1 at ¶ 25.

On or about December 10, 2008, GSK entered into a certain written services agreement entitled "Statement of Work Number 11" with Towers Watson which set forth the details of the scope of work to be performed by Towers Watson on behalf of GSK related to the preparation and processing of severance packets ("Scope of Work"). *See* Dkt. No. 65-1 at ¶ 26; *but see* Dkt. No. 73-1 at ¶ 26. The Scope of Work documents automatically renewed and was in full force and effect until May of 2012. *See* Dkt. No. 65-1 at ¶ 27.

In 2011 and 2012, Joseph Bailey Turner was the manager at Towers Watson responsible for carrying out the terms and provisions of the Scope of Work project for and on behalf of GSK regarding the preparation and processing of severance packets. *See id.* at ¶ 29.[7] The roles and responsibilities of Towers Watson and GSK with respect to the issuance and processing of

---

[7] The Court acknowledges that Defendants object to any implications or outright assertions claiming that Towers Watson acted as GSK's agent.

severance packets, including releases, were set forth on a document prepared by GSK entitled "Desktop Procedure." *Id.* at ¶ 30. In accordance with the terms of the Scope of Work and Desktop Procedure, GSK prepared and sent to Towers Watson templates of documents to use in conjunction with the generation of severance packets. *See id.* at ¶ 31. In accordance with the terms of the Severance Pay Plan, Scope of Work and Desktop Procedure, at the direction and on behalf of GSK, Towers Watson generated severance packets, including a severance election form and a release, tailored to specific terminated GSK employees. *See id.* at ¶ 32.

Two of the expressly defined responsibilities of Towers Watson in the Desktop Procedure are set forth below:

> 12. Towers Watson receives completed [severance and release] forms from employee and records receipt of paper work. Towers Watson creates a file that provides the names of the employees that they have received paper work from . . . File is sent to [GSK] Benefits Specialty Team to distribute to the GSK HR Service Centre.
>
> 12.1. Towers reviews returned [severance and release forms] to determine if they have what they need to proceed with the payment of severance. If they [sic] are any issues with the paper work that they have received from an employee, Towers on the day they receive the paper work will sent the employee a letter telling what the issue is with the returned paper work. They will include new paper work if it needs to be completed.

Dkt. No. 65-1 at ¶ 34.

Included among the severance package documents was a four-page General Release written by GSK. *See id.* at ¶ 35. The releases contained in the severance packets including the following language:

> **NOTICE: YOU SHOULD THOROUGHLY REVIEW AND UNDERSTAND THE TERMS, CONDITIONS AND EFFECT OF . . . THIS GENERAL RELEASE . . . YOU ARE ADVISED**

23

**TO CONSULT WITH AN ATTORNEY BEFORE YOU SIGN
THIS GENERAL RELEASE . . .**

Dkt. No. 65-1 at ¶ 36.

The general releases included in the severance packets sent to terminated GSK employees contained expressed exclusions specifically set forth in subparagraph 1B thereof. *See id.* at ¶ 37. The general releases included in the severance packets contained the following language on the last page in all capital letters and bold font: "IF YOU CHOOSE EITHER NOT TO SIGN OR TO REVOKE THIS GENERAL RELEASE, IT WILL NOT BE BINDING ON YOU AND, YOU WILL NOT BE ENTITLED TO ANY MONIES OR CONSIDERATION DESCRIBED IN THIS GENERAL RELEASE." *Id.* at ¶ 38.

Admittedly, the Severance Packets sent to terminated GSK employees did not state the employee is prohibited from altering the releases in any form. *See id.* at ¶ 39. The first step in the Scope of Work and Desktop Procedure was for Towers Watson to prepare the severance packet based on unique employee information received from GSK regarding employee terminations. The severance packets were then generated, reviewed by a second person at Towers Watson, database entries were made, a hard copy of each severance packet was printed and the originals were sent to GSK for distribution. *See id.* at ¶ 40. The next step in the Scope of Work and Desktop Procedure involved the severance packet being distributed to the employees. This was undertaken by GSK, with the severance packet being mailed by GSK directly to each terminated GSK employee together with a self addressed return envelope. *See id.* at ¶ 41. The next step in the Scope of Work and Desktop Procedure was to receive the original signed severance packets back in the mail from the terminated employee. Once the employees completed the severance packets, the original severance packets would be mailed in

24

the self-addressed, stamped envelope, to a post office box maintained by Towers Watson in the name of GSK. *See id.* at ¶ 42. Once Towers Watson received the packets back from the employees, the GSK severance packets would be reviewed by two separate Towers Watson employees to confirm that the documents contained in the packets conformed to the GSK standards. *See id.* at ¶ 43.

### Towers Watson Checklist

When Towers Watson received the returned original severance packets, including releases, from a terminated GSK employee, a Towers Watson employee (a "reviewer") would undertake the initial review of the paperwork, complete a checklist and enter pertinent information into a database. *See* Dkt. No. 65-1 at ¶ 44. The checklist could be completed by the reviewer in electronic format or hard copy. *See id.* at ¶ 45.

Upon reviewing the paperwork returned from a terminated GSK employee, including the releases, the reviewer's job included examining the general release on behalf of GSK to ascertain if the document contained any typed edits, handwritten changes or other similar mark ups. Dkt. No. 65-1 at ¶ 46. If the reviewer was utilizing the electronic checklist, the reviewer was required to answer the following question in connection with their review of the general release and other severance packet documents: "**NONE** of the returned pages look copied, or have intentionally been marked up?" *See id.* at ¶ 47. If the reviewer was utilizing the hard copy checklist, the reviewer was required to answer the following question in connection with their review of the general release and other severance packet documents: "Are all the pages 'clean'; that is, no hand-written mark-ups have been made?" *Id.* at ¶ 48. Upon reviewing the releases returned from a terminated GSK employee, the reviewer was likewise required to answer the following

question on the hard copy of the checklist: "Do all the pages look like they are the original pages?" *Id.* at ¶ 49. One of the jobs of the reviewer in filling out the checklist and reviewing the general releases returned by terminated GSK employees was to identify whether or not there were edits in some form to the release. *See id.* at ¶ 50. Edits to the general release returned by terminated GSK employees include not only hand-written edits, but also typed edits. *See id.* at ¶ 51. In 2011 and 2012, Towers Watson had two employees who were primarily responsible for conducting the initial review of incoming GSK severance packets and completion of the checklist: Christopher Park and Kelly Tomer. *See id.* at ¶ 52.

Within a day or two of the receipt and first review of the original completed severance packets at Towers Watson, a second Towers Watson employee (an "analyst") would review the paperwork to determine, among other things, if the information contained on the checklist was correct and accurate. Dkt. No. 65-1 at ¶ 53. The analyst was also responsible for determining whether a general release returned by a terminated GSK employee was clean and free from hand written or typed edits. *See id.* at ¶ 54. In 2011 and 2012, Towers Watson had three employees in the role of analyst to conduct the secondary review of incoming GSK severance packets: Lori Fluharty, Kevin Grandstaff and Brendan Peck. *See id.* at ¶ 55. If any defects were discovered in the severance packets returned by terminated GSK employees, generally the error would be further reviewed by an analyst and, depending on the type of change, would be "escalated" to GSK for further review and action. *See id.* at ¶ 56.

When Towers Watson completed their handling of an employee's severance packet and payment was made to the employee, Towers Watson would close their file, and would send the original severance packet, including the original release and checklist, to GSK. *See* Dkt. No. 65-

1 at ¶ 59.  Thereafter, within four to five months of receipt of the initial information to open a file, Towers Watson would package up the severance packet information and ship it to GSK at their offices in the Research Triangle of North Carolina, at which point GSK maintained exclusive possession and control of the general release and other file documents.  *See id.* at ¶ 60.

### Southern District of Florida Action

On or about July 7, 2009, a Complaint was filed by certain shareholders of SLI against Defendants alleging certain securities fraud violations in an action entitled *Bacon v. Stiefel Laboratories, Inc.*, Case No. 09-21871 (S.D. Fla.) ("*Bacon* Action").  Dkt. No. 65-1 at ¶ 61.  In the *Bacon* Action, the plaintiffs sought class certification on behalf of participants in the SLI ESBP who sold their shares in 2008 prior to the merger with GSK.  *See id.* at ¶ 62.

### GSK Receives Prior Notice of an Altered Release From Bruce MacDonald

Sometime prior to May 14, 2011, GSK terminated Bruce MacDonald ("MacDonald") as an employee.  Dkt. No. 65-1 at ¶ 63.  Sometime prior to May 14, 2011, GSK sent MacDonald a severance packet including a General Release.  *See id.* at ¶ 64.  On or about May 14, 2011, MacDonald returned his severance packet, including a General Release, to Towers Watson.  *See id.* at ¶ 65.  The General Release returned by Bruce MacDonald, a former Stiefel Labs employee, contained additional language added by Mr. MacDonald ("MacDonald Release"), to wit:

> THIS GENERAL RELEASE DOES NOT APPLY TO CLAIMS RELATED TO THE COLLECTION OF POTENTIAL CLASS ACTION LAWSUITS ENTITLED BACON, ET. AL. V. STIEFEL LABORATORIES, INC. ET. AL. DOCKETED IN THE SOUTHERN DISTRICT OF FLORIDA OR TO CLAIMS RELATED TO SIMILAR LAWSUITS BROUGHT BY FORMER SHAREHOLDERS OF STIEFEL LABORATORIES, INC.

*See id.* at ¶ 66.  A Towers Watson reviewer discovered the MacDonald Release.  *See id.* at ¶ 67.

**Notice of Written Inquiries About Amendments to General Release**

In fact, prior to receipt of the altered MacDonald general release, on June 15, 2010, another GSK employee, Michael Teller, sent an email to Valerie Ruff, a GSK human resources department head in Oak Hill, inquiring as to whether a number of other terminated GSK employees could amend the General Release to exclude claims for securities fraud similar to those claims asserted in the *Bacon* Action.  Dkt. No. 65-1 at ¶ 69.  The GSK response to Michael Teller from Valerie Ruff indicated that GSK would not alter the release themselves, but that terminated employees should seek their own counsel relative to their own general release.  *See id.* at ¶ 70.  As of June 2010, GSK was aware that a number of terminated former employees of Stiefel Labs were intent on preserving their rights in the *Bacon* class action lawsuit against Stiefel by altering or editing the General Release in the severance packet.  *See id.* at ¶ 71; *see also* Dkt. No. 65-19, Ex. PX24.

**Plaintiffs' Terminations from GSK**

After Michael Teller's inquiry to GSK regarding amendments to the general release to preserve rights in the *Bacon* class action lawsuit, and after Bruce MacDonald sent his altered release to Towers Watson and GSK to preserve his rights in the *Bacon* class action lawsuit, the four named Plaintiffs were notified that their employment with GSK and would be ending.  *See* Dkt. No. 65-1 at ¶ 72.  Plaintiff Beede was terminated as an employee of GSK on June 28, 2011.  *See id.* at ¶ 73.  Plaintiff Halligan was terminated as an employee of GSK on December 7, 2011.  *See id.* at ¶ 74.  Plaintiff Weeks was terminated as an employee on December 30, 2011.  *See id.* at ¶ 75.  Finally, Plaintiff Mottl was terminated as an employee of GSK in July of 2012.  *See id.* at ¶ 76.

**Plaintiff Beede's Altered Release**

In or around late April/early May of 2011, Plaintiff Beede received a severance packet from GSK that included a General Release.  *See* Dkt. No. 65-1 at ¶ 77.  Pursuant to the express language in the General Release, Plaintiff Beede consulted an attorney prior to signing the General Release.  *See id.* at ¶ 78.  Prior to executing the Release, Plaintiff Beede added the following conspicuous exception to the exceptions listed in Paragraph I.B thereof:

> This General Release does not apply to any claims I may have against Stiefel Laboratories, Inc., arising from its purchase of my shares of stock in Stiefel prior to acquisition by [GSK].

*See id.* at ¶ 79.

In adding the express exception to the general release, Plaintiffs claim that Clifford Beede intended to preserve his right to make claims against Stiefel Laboratories, Inc., including all of its officers, Board of Directors, and Charles Stiefel.  Dkt. No. 65-1 at ¶ 80.  GSK and Towers Watson employees admitted that the alterations made by Plaintiff Beede to the Beede Release are readily apparent to anyone reviewing or examining the general release.  *See id.* at ¶ 81; Dkt. No. 65-11 at 28-29; Dkt. No. 65-13 at 43-45.  The alterations made by Plaintiff Beede to the Beede Release were similar to the changes made by Bruce MacDonald to the MacDonald Release in that they both reference a lawsuit with Stiefel.  *See* Dkt. No. 65-1 at ¶ 82.  Beede's alterations were inserted into Section I(B) using a series of three symbols (***) typed in both the body of the release, with portions of the alteration extending into the margin near Section I(B), and again conspicuously typed in the open space that creates a margin between Section I and Section II of the Beede Release.  *See id.* at ¶ 83.

On or about June 10, 2011, Plaintiff Beede returned the Beede Release to GSK using the envelope included in the severance packet. Dkt. No. 65-1 at ¶ 84. Plaintiff Beede timely returned the Beede Release as required by the express terms of the severance packet. *See id.* at ¶ 85. On or about June 16, 2011, Towers Watson received the Beede Release. *See id.* at ¶ 86. Upon receiving the Beede Release, Towers Watson reviewer Kelly Tomer (identified as "TOMERK") reviewed the Beede Release and prepared a checklist. *See id.* at ¶ 87. Towers Watson reviewer Kelly Tomer, acting on behalf of GSK, reviewed the Beede Release containing the alterations and accepted same. *See id.* at ¶ 88. After GSK reviewer Kelly Tomer competed her review of the Beede Release, Towers Watson analyst Kevin Grandstaff conducted a second review of the Beede Release. *See id.* at ¶ 89.

Kevin Grandstaff likewise found the Beede Release acceptable. Dkt. No. 65-1 at ¶ 90. Upon accepting the Beede Release, GSK sent Plaintiff Beede his severance benefits as provided under the terms of the severance packet. *See id.* at ¶ 91.

On August 14, 2012, nearly one year after Plaintiff Beede sent the Beede Release to GSK, and well after GSK accepted the altered release and paid Plaintiff Beede his last benefits due under the terms of the severance packet, Plaintiff Beede received a letter from GSK's in-house counsel stating that GSK had performed an "audit" of Plaintiff Beede's personnel records. *See* Dkt. No. 65-1 at ¶ 93. The letter claimed that Plaintiff Beede was not entitled to the severance pay he already received because he allegedly "did not sign and return the actual General Release on which [his] severance offer was conditioned." *Id.* at ¶ 93. Plaintiff Beede contends that, because GSK had long since accepted the altered Beede Release and made

payment in full in reliance upon same, Plaintiff Beede took no action in response to his receipt of the GSK letter. *See id.* at ¶ 94.

### Plaintiff Halligan's Altered Release

In or around late November/early December of 2011, Plaintiff Halligan received a severance packet from GSK that included a General Release. *See* Dkt. No. 65-1 at ¶ 95. Pursuant to the express language in the General Release, Plaintiff Halligan consulted an attorney prior to signing the General Release. *See id.* at ¶ 96. Prior to executing the General Release, Plaintiff Halligan added the following exception to the exceptions listed in Paragraph I.B thereof:

> This General Release does not apply to any claims I may have against Stiefel Laboratories, Inc., Charles W. Stiefel, Brent D. Stiefel, Todd Stiefel and/or Lodewijk De Vink arising from its purchase of my of stock in Stiefel prior to its acquisition by GlaxoSmithKline.

*Id.* at ¶ 97.

Plaintiff Halligan's alterations were inserted into Section I(B) using an asterisk symbol (*) typed in both the body of the release, with portions of the alteration extending into the margin near Section I(B), and again typed in the open space that creates a margin between Section I and Section II of the Halligan Release. *See id.* at ¶ 100. In addition, in an effort to highlight the alterations made to the Halligan Release, at the time she prepared the executed severance packet for return to GSK, Plaintiff Halligan testified that she attached to the Halligan Release a pink "sticky" note in the exact area where the alterations were included. *See id.* at ¶ 101. Plaintiff Halligan testified that, on or about December 14, 2011, she returned the Halligan

Release with the sticky note attached to GSK using the envelope included in the severance packet. *See id.* at ¶ 103.

Towers Watson received the Halligan Release on or about December 21, 2011. *See id.* at ¶ 104. Upon receipt, Towers Watson re viewer Kelly Tomer (identified as "KT") reviewed the Halligan Release, prepared a checklist, and accepted the same. *See id.* at ¶¶ 105-106. Thereafter, Towers Watson analyst Kevin Grandstaff conducted a second review. *See id.* at ¶ 107. Upon Mr. Grandstaff's acceptance of the Halligan Release, GSK sent Plaintiff Halligan her severance benefits as provided under the terms of the severance packet. *See id.* at ¶¶ 108-109.

On or about September 20, 2012, nearly one year after Plaintiff Halligan sent the Halligan Release to GSK, and well after GSK accepted the altered release and paid Plaintiff Halligan the last benefits due under the terms of the severance packet, Plaintiff Halligan received a letter from GSK's in-house counsel stating that GSK had performed an "audit" of Plaintiff Halligan's personnel records. *See* Dkt. No. 65-1 at ¶ 112. The letter indicated that Plaintiff Halligan was not entitled to the severance pay she had already received because she allegedly "did not sign and return the actual General Release on which [her] severance offer was conditioned." *Id.*

### Plaintiff Weeks' Altered Release

In or around late November/Early December of 2011, Plaintiff Weeks received a severance packet from GSK that included a General Release. *See id.* at ¶ 114. Pursuant to the express language in the General Release, Plaintiff Weeks consulted an attorney prior to signing the General Release. *See id.* at ¶ 115. Prior to executing the General Release, Plaintiff Weeks added the following exception to the exceptions listed in Paragraph I.B thereof:

> This General Release does not apply to any claims I may have
> against Stiefel Laboratories, Inc., Charles W. Stiefel, Brent D.
> Stiefel, Todd Stiefel and/or Lodewijk De Vink arising from its
> purchase of my of stock in Stiefel prior to its acquisition by
> GlaxoSmithKline.

*Id.* at ¶ 116.  Plaintiff Weeks' alterations were inserted into Section I(B) using an asterisk symbol (*) typed in both the body of the release, with portions of the alteration extending into the margin near Section I(B), and again typed in the open space that creates a margin between Section I and Section II of the Weeks Release.  *See* Dkt. No. 65-1 at ¶ 118.

On or about January 2, 2012, Plaintiff Weeks returned the Weeks Release to GSK using the envelope included in the severance packet.  *See id.* at ¶ 121.  On or about January 6, 2012, Towers Watson received the Weeks Release.  *See id.* at ¶ 122.  Upon receiving the Weeks Release, Towers Watson reviewer Christopher Park (identified as "CP") reviewed the Weeks Release, prepared a checklist, and accepted the release.  *See id.* at ¶¶ 123-124.  After GSK reviewer Christopher Park completed his review of the Weeks Release, Towers Watson analyst Kevin Grandstaff conducted a second review of the Weeks Release, and he likewise found the Weeks Release acceptable.  *See id.* at ¶ 125.  Thereafter, GSK sent Plaintiff Weeks her severance benefits as provided under the terms of the severance packet.  *See id.* at ¶ 126.

On or about September 20, 2012, nearly one year after Plaintiff Weeks sent the Weeks Release to GSK, and after GSK accepted the Release and paid the last benefits due under the terms of the severance packet, Plaintiff Weeks received a letter from GSK's in-house counsel stating that GSK had performed an "audit" of Plaintiff Weeks' personnel records.  *See id.* at ¶ 129.  In the letter, GSK claimed that Plaintiff Weeks was not entitled to the severance pay she

already received because she allegedly "did not sign and return the actual General Release on which [her] severance offer was conditioned." *Id.*

### Plaintiff Mottl's Altered Release

In approximately May of 2012, GSK ended its Scope of Work arrangement with Towers Watson and took back the responsibility of receiving, reviewing and processing severance packets returned by terminated GSK employees. *See* Dkt. No. 65-1 at ¶ 131. In May of 2012, Harry Bowers and Gwen Ubil were the employees at GSK responsible for the review and processing of severance packets returned by GSK employees. *See id.* at ¶ 132.

In or around late November/Early December of 2011, Plaintiff Mottl received a severance packet from GSK that included a General Release. *See id.* at ¶ 133. Pursuant to the express language in the General Release, Plaintiff Mottl consulted an attorney prior to signing the General Release. *See id.* at ¶ 134. Prior to executing the General Release, Plaintiff Mottl added the following exception to the exceptions listed in Paragraph I.B thereof:

> This General Release does not apply to any claims I may have against Stiefel Laboratories, Inc., Charles W. Stiefel, Brent D. Stiefel, Todd Stiefel and/or Lodewijk De Vink arising from its purchase of my shares of stock in Stiefel prior to its acquisition by GlaxoSmithKline.

*Id.* at ¶ 135.

The Mottl Release was returned to GSK and reviewed by GSK employee Gwen Ubil. *See id.* at ¶ 138. After reviewing the Mottl Release, GSK notified Plaintiff Mottl that she would need to sign a clean, unaltered General Release to receive severance payments. *See id.* at ¶ 140. Plaintiff Mottl never signed an unaltered General Release and never received severance money or benefits from GSK. *See id.* at ¶¶ 141-142.

34

**Towers Watson Audit**

On Friday August 3, 2012, GSK attorney Adrianna Carter discovered the Beede Release and emailed GSK employee Gwen Ubil stating, "[s]ee attached release where [Beede] added language indicating that the [sic] was not releasing certain claims against Stiefel." Dkt. No. 65-1 at ¶ 144. Thereafter, GSK employee Gwen Ubil emailed Towers Watson employee Joseph Bailey Turner asking whether Towers Watson "picked up" on the changes made in the Beede Release. *See id.* at ¶ 145. On Friday August 3, 2012, Mr. Turner emailed Ms. Ubil and advised that Towers Watson "did not notice the edits made to [Beede's] General Release . . . I apologize for any inconvenience this may have caused." *Id.* at ¶ 146.

At this point, GSK requested that Towers Watson supply a list of former SLI employees who received severance packets. *See id.* at ¶ 147. As of August 6, 2012, the original severance packets including the checklists and releases for 195 former SLI employees – including Plaintiffs – were stored at GSK's Research Triangle Park facility in North Carolina. *See id.* at ¶ 149. On August 21, 2012, at the request of GSK, Towers Watson conducted a third review of all releases received from GSK employees for changes made to the General Releases. *See id.* at ¶ 151. On August 21, 2012, Towers Watson identified three (3) releases that were edited, *i.e.*, the Beede, Weeks, and Halligan Releases. *See id.* at ¶ 152. As of August 21, 2012, all severance benefits and payments had been paid and made to Plaintiffs Beede, Weeks and Halligan. *See id.* at ¶ 153.

Currently before the Court are the following motions: (1) Plaintiffs' motion for partial summary judgment on Defendants' counter claims (Dkt. No. 65); and (2) Defendants' motion for partial summary judgment against Plaintiffs Beede, Halligan, and Weeks (Dkt. No. 67-1).

# III. DISCUSSION

## A.      Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.      Plaintiffs' and Defendants' motions for partial summary judgment

In their motion for partial summary judgment, Plaintiffs seek dismissal of counts one and two of Defendants' counterclaims, alleging breach of contract and unjust enrichment, respectively. *See* Dkt. No. 65-2. Plaintiffs contend that count one must be dismissed because the altered releases were counteroffers excepting the claims asserted in this action, which were reviewed and accepted by GSK's performance. *See id.* at 13-27. Next, Plaintiffs claim that they should be awarded summary judgment as to Defendants' second counterclaim because the doctrine of unjust enrichment cannot be used to circumvent the bargained-for benefits contained in the contracts with third-party GSK. *See id.* at 27-31. In response, Defendants contend that Plaintiffs are not entitled to summary judgment on SLI's breach-of-contract counterclaims because SLI has standing to assert the counterclaims against Plaintiffs. *See* Dkt. No. 73 at 10-11. Further, Defendants argue that Plaintiffs' motion must be denied because Plaintiffs are in breach of the General Release Agreements. *See id.* at 11-17.

In their motion for partial summary judgment, Defendants contend that they are entitled to summary judgment on all claims released by Plaintiffs in the General Release Agreements. *See* Dkt. No. 67-1 at 10-11. Defendants argue that the "General Release Agreements executed by Plaintiffs contain a clear and unambiguous broad general release provision that includes all claims asserted by Plaintiffs against all Defendants in this case. Thus, unless Plaintiffs can show their claims were excluded from the general release, their claims must be dismissed with prejudice." *Id.* Further, Defendants assert, "assuming for purposes of summary judgment only, that Plaintiffs' alterations to subparagraph I.B. of the General Release Agreements are effective, it is undisputed that none of the Plaintiffs excluded from their general releases any of their claims against Defendants Steve Karasick, Michael Cornelius, and Matt Pattullo." *Id.* at 11.

Moreover, Defendants contend that Plaintiff Beede released all of his claims against Defendants Charles Stiefel, Brent Stiefel, and Todd Stiefel because his alteration of the General Release Agreement, which differs from the alterations made by Plaintiffs Halligan and Weeks, only seeks to exclude those claims he may have "against Stiefel Laboratories, Inc. arising from its purchase of my shares of stock in Stiefel prior to its acquisition by GlaxoSmithKline." *Id.* at 12.

Thereafter, Defendants contend that Defendant Stiefel Labs is entitled to summary judgment on its breach of contract counterclaims due to Plaintiffs' violation of the covenant-not-to-sue provisions contained in the General Release Agreements. *See id.* at 12-14. Specifically, Defendants assert that "[b]y filing and pursuing their released claims against Defendants Steve Karasick, Michael Cornelius, and Matt Pattullo, all three Plaintiffs violated the covenant-not-to-sue provision of their General Release Agreements. Beede further violated the covenant-not-to-sue by filing and pursuing his claims against Charles Stiefel, Brent Stiefel, and Todd Stiefel." *Id.* at 13.

### 1. Standing

Plaintiffs argue that Defendants lack standing to enforce the terms of Plaintiffs' General Release Agreements because "Defendants were not signatories to the original releases, did not negotiate or prepare the original releases and did not participate in the acceptance (or potential rejection) of the Beede Release, Halligan Release or Weeks Release." Dkt. No. 65-2 at 24. Defendants, however, contend that the only Defendant asserting any counterclaims against Plaintiffs is Defendant Stiefel Labs. *See* Dkt. No. 73 at 10-11. As such, Defendants argue that "it is not necessary for any of the individual Defendants to establish that they have standing to

sue" and that Stiefel Labs has standing to sue because it is an "intended, third-party beneficiary of the General Release Agreements." *Id.* (citations omitted). Finally, Defendants assert that Defendant Stiefel Labs has standing to enforce the Release Agreements as assignee of all of GSK's rights. *See id.* at 11 (citing Dkt. No. 67-11) (other citations omitted).

As Defendants correctly contend, the counterclaims in Defendants' answer were brought only by Defendant Stiefel Labs and not the individual Defendants; and, therefore, only Stiefel Labs needs to establish its standing to sue. *See* Dkt. No. 45 at 32-44. Defendants are also correct that, as an intended, third-party beneficiary of the Release Agreements, Defendant Stiefel Labs has standing. *See Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (holding that, under New York law, "in order to recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party") (citation omitted). In the present matter, the General Release specifically states that it applies to GSK, "its affiliates, parents, successors, predecessors, subsidiaries, and assigns, and all of their present or former directors, trustees, officers, employees, representatives, agents, benefits plans (together with all benefits plan administrators, fiduciaries, trustees and insurers) and attorneys (hereinafter referred to individuals and collectively as the "Company"). . . ." Dkt. No. 65-19, Ex. PX11 at TWSTI000089. In light of GSK's purchase, Defendant Stiefel labs clearly falls within the definition set forth in paragraph I.A. of the General Release.

Additionally, as Defendants correctly contend, Defendant Stiefel Labs has standing to enforce the General Release Agreements as assignee of GSK's rights. *See* Dkt. No. 67-11; *Deutsche Bank Nat'l Trust Co. v. Torres*, No, 2999-08, 2014 WL 5461541, *5 (N.Y. Sup. Sept. 26, 2014) ("When a valid assignment is made, the assignee steps into the assignor's shoes and

acquires whatever rights the latter had") (citing *In re Stralem*, 758 N.Y.S.2d 345, 347 (2d Dep't 2003)); *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998) ("Under common law, an assignee steps into the assignor's shoes and acquires whatever rights the latter had") (citation omitted).

Accordingly, the Court denies Plaintiffs' partial motion for summary judgment on this ground.

### 2. Breach of contract generally

Under New York law, a party alleging a breach of contract claim must allege the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted). "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff*, 171 F. Supp. 2d at 358 (citation omitted).

"When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (2d Dep't 2011) (citations omitted). "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). "When the question is a contract's proper construction, summary judgment may

be granted when its words convey a definite and precise meaning absent any ambiguity." *Id.* (citations omitted). "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate . . . since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Id.*

The Second Circuit has "defined ambiguous language as that which is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'" *Id.* (quotations omitted). "Conversely, language is not ambiguous when it has '"a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion."'" *Id.* (quotations omitted). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties' intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'" *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotation and other citations omitted).

### 3. Counteroffers

"Under New York law, '[m]utual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.'" *Register.com, Inc.*

*v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (quoting *Maffea v. Ippolito*, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653 (2d Dep't 1998)) (other citation omitted). "'The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract.'" *Id.* (quotation and other citations omitted). "A party's conduct indicates assent when 'he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (quoting Restatement (Second) of Contracts § 19(2) (1981)), *superceded by statute on other grounds as recognized in Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013)).

When a party sends a proposed contract to another party who subsequently inserts language thereto, a counteroffer is made. *See Daimon v. Fridman*, 5 A.D.3d 426, 427 (2d Dep't 2004) (citation omitted); *see also Ladau v. Hillier Group, Inc.*, No. 02 Civ. 4703, 2004 WL 691520, *3 (S.D.N.Y. Mar. 31, 2004) ("'New York follows the traditional common law view, which holds that an acceptance that is conditioned on terms at variance with those in the offer operates as a counteroffer and terminates the original offer'") (quotation and other citation omitted). "While mere silence, when not misleading, cannot be construed as acceptance . . . , a counteroffer may be accepted by conduct." *Id.* (citations omitted). Further, "'[f]ailure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.'" *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839-40 (S.D.N.Y. 2012) (quoting *Centrifugal Force, Inc. v. Softnet Commc'n Inc.*, No. 08 Civ. 5463, 2011 WL 744732, *7 (S.D.N.Y. Mar. 1, 2011)); *see also Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11 (1988) (citations omitted); *Davidowitz v. Patridge*, No. 08 Civ. 6962, 2010 WL 5186803, *10

42

(S.D.N.Y. Dec. 7, 2010) (holding that "sophisticated business persons are bound by a contract that they sign despite their failure to read it") (citing *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11-12, 534 N.E.2d 824, 828-29, 537 N.Y.S.2d 787, 792 (1988); *Daniel Gale Assocs. v. Hillcrest Estates, Ltd.*, 283 A.D.2d 386, 387-88, 724 N.Y.S.2d 201, 202-03 (2d Dep't 2001)).

### 4. *Application*

In the present matter, the Court finds that the Benefits at Termination of Employment packet that Defendants sent to Plaintiffs, through Towers Watson, was an offer. Upon modifying the General Release and returning that signed and modified document to Towers Watson, Plaintiffs made a counteroffer, thereby rejecting the original offer. At this point, Towers Watson, as GSK's appointed agent, conducted multiple levels of review of the counteroffer. Upon completing this review, Defendants accepted the counteroffer through their performance.

The language that Plaintiffs inserted into the modified General Releases was clear, in a different font than the rest of the agreement, and delineated the modifications with an asterisk symbol(s) which extended into the margins of the documents. Moreover, Plaintiff Halligan's uncontroverted testimony indicates that, in an effort to highlight the alterations made to the Halligan Release, at the time she prepared the executed severance packet for return to GSK, she attached to the Halligan Release a pink "sticky" note in the exact area where the alterations were included. *See* Dkt. No. 65-1 at ¶ 101. In light of these facts, and the fact that the General Releases are only four (4) pages long, it cannot be said that these alterations were anything other than clear and conspicuous. The fact that Defendants may have overlooked these clear and

conspicuous changes is inapposite. Defendants, and their agent Towers Watson, are sophisticated business persons and their failure to read or comprehend this straightforward counteroffer does not render the counteroffers invalid. *See Fteja*, 841 F. Supp. 2d at 839-40 (holding that "'[f]ailure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract'") (quoting *Centrifugal Force, Inc. v. Softnet Commc'n Inc.*, No. 08 Civ. 5463, 2011 WL 744732, *7 (S.D.N.Y. Mar. 1, 2011)); *Davidowitz*, 2010 WL 5186803, at *10 (holding that "sophisticated business persons are bound by a contract that they sign despite their failure to read it") (citing *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11-12 (1988); *Daniel Gale Assocs. v. Hillcrest Estates, Ltd.*, 283 A.D.2d 386, 387-88 (2d Dep't 2001)).

As to the scope of the modified General Releases, the Court agrees with Plaintiffs that the only reasonable interpretation of "Stiefel Laboratories, Inc." includes not just the corporate entity, but also all of its present and former directors, trustees, officers, employees, representatives, agents and benefits plan. As discussed, in drafting the General Release language contained in the severance packets, GSK expressly included in the definition of the "Company" all of [GSK's] present or former directors, trustees, officers, employees, representatives, agents, benefit plans (together with all benefit plan administrators, fiduciaries, trustees and insurers) and attorneys[.]" Dkt. No. 65-19, Ex. PX11 at TWSTI000089. By doing so, the language employed in the release relating to a company includes all of the company's officers, directors, representative, agents, benefit plan, along with all plan administrators, fiduciaries, and trustees.

In the release prepared by GSK, the scope and applicability was expressly limited by the exceptions "that are set forth in subparagraph I.B." Plaintiffs Beede, Halligan and Weeks added the readily apparent exceptions to their respective releases in this very subparagraph. These added exceptions included, among other things, claims against "Stiefel Laboratories, Inc." As Defendants point out, Plaintiffs brought suit against the individual Defendants in their capacities as ERISA fiduciaries. *See* Dkt. No. 73 at 15. An individual's status as an ERISA fiduciary is a status that is separate and distinct from their status as corporate officers and for which there is no *respondeat superior* liability. *See In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 355 (S.D.N.Y. 2009) (refusing to find "fiduciary responsibility . . . based on a respondeat superior theory" against Morgan Stanley) (citations omitted). If the Court were to afford the term "Stiefel Laboratories, Inc." the definition urged by Defendants, it would render meaningless the inclusion of this term by Plaintiffs. *See Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324-25 (2007) (holding that a contract should not be interpreted so as to render any portion of it meaningless) (citations omitted).

Moreover, the Court's holding is consistent with the general law applicable to releases and covenants not to sue. Under New York law, a party seeking to prove the validity of a purported release has the burden of proof on this issue. *See Khalid v. Scagnelli*, 290 A.D.2d 352, 354 (1st Dep't 2002). "For a document to constitute a release from liability, it must contain an explicit, unmistakable and unequivocal statement by one party that it intends to abandon its right to prosecute a present or future claim against the other party." *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382-83 (S.D.N.Y. 2005). "[T]he meaning and coverage of a general release necessarily depends upon the controversy being settled and upon the purpose for which the

release was given. A release may not be read to cover matters which the parties did not intend to cover." *B.B. & S. Treated Lumber Co. v. Groundwater Tech., Inc.*, 256 A.D.2d 430, 432 (2d Dep't 1998) (quoting *Dillon v. Dean*, 236 A.D.2d 360, 360 (2d Dep't 1997); *see also Spears v. Spears Fence, Inc.*, 60 A.D.3d 752, 753 (2d Dep't 2009).

In the present matter, if the Court were to interpret this provision in the manner urged by Defendants, the modified releases would cover matters not intended in the counteroffer made by Plaintiffs, subsequently accepted by Defendants through their full performance after thorough review. Without question, when read as a whole, claims excepted against "Stiefel Laboratories, Inc." "arising from its purchase of my shares of stock in Stiefel prior to acquisition by [GSK]" logically must include those officers, agents, trustees, fiduciaries, etc. responsible for making that purchase.

Accordingly, the Court finds that the undisputed facts supports Plaintiffs' position and denies Defendants' motion for summary judgment. Based on the undisputed material facts, the Court finds that the inclusion of Stiefel Laboratories, Inc. in the modified General Releases applies to all named Defendants, who were among other things, employees, officers, trustees, and fiduciaries of Stiefel Laboratories, Inc. and the ESBP; and, therefore, the Court grants Plaintiffs' motion for partial summary judgment as to Defendant Stiefel Labs' breach-of-contract counterclaims.[8]

---

[8] Even if the Court found that the term Stiefel Laboratories, Inc. contained in the modified General Release was ambiguous, Plaintiffs' intent is clearly relevant and the most indicative of the true meaning of the term "Stiefel Laboratories, Inc." since they personally included the term in the modified General Releases, without conferring with Defendants. Plaintiffs' testimony during their respective depositions confirms their intent to exclude the named Defendants from the Releases and Defendants have not and cannot offer any contradicting evidence of Plaintiffs' intent. *See Elbit Systems Ltd. v. Credit Suisse Group*, 842 F. Supp. 2d 733, 739 (S.D.N.Y. 2012) (holding

(continued...)

### 5. Unjust enrichment counterclaim

In Defendants' second counterclaim, Defendant SLI asserts an unjust enrichment claim against Plaintiffs in the alternative to the breach of contract claims. *See* Dkt. No. 45 at 41-42. Defendant SLI contends that Plaintiffs "were not permitted to alter the General Release form provided in their Packages and then retain the severance payments provided to them by GSK and Stiefel Labs." *Id.* at 42. Further, Defendant SLI argues that Plaintiffs "never notified GSK, Stiefel Labs, or any of the other Defendants of their alterations of the General Releases and neither GSK nor any of the Defendants agreed to the inclusion of [Plaintiffs'] additional language in the General Releases." *Id.*

"To prevail on a claim for unjust enrichment, the moving party must show that the defendant received money from or was otherwise enriched by the plaintiff to the defendant's benefit and, pursuant to principles of equity and good conscience, the defendant should not retain what plaintiff seeks to recover." *Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01 Civ. 4426, 2004 WL 758303, *11 (S.D.N.Y. Apr. 7, 2004) (citing, *inter alia*, *Clark v. Daby*, 300 A.D.2d 732 (3d Dep't 2002)). "[C]laims for unjust enrichment seek restitution and are based upon theories of quasi-contract." *Deutsche Asset Mgmt.*, 2004 WL 758303, at *11 (citing *Matter of Estate of Witbeck*, 245 A.D.2d 848 (3d Dep't 1997)). "A quasi-contract is one implied by law, where none in fact exists." *Deutsche Asset Mgmt.*, 2004 WL 758303, at *11 (citing *James v.*

---

[8](...continued)
that, "[u]nder New York law, a release must be construed in accordance with the intent of the party who executed it") (citing *Gross v. Sweet*, 49 N.Y.2d 102, 108, 424 N.Y.S.2d 365, 400 N.E.2d 306 (1979)). Although the actual intent of the parties regarding an ambiguity in a contract generally presents a question of fact for the jury to decide, where, as here, "the extrinsic evidence is so one-sided that no reasonable factfinder could find to the contrary, . . . the court should resolve the ambiguity as a matter of law." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) (citations omitted).

*State*, 90 A.D.2d 342 (4th Dep't 1982)).  Thus, quasi-contract relief is only available in the absence of an enforceable written contract which governs the same subject matter between the parties.  *See Seiden Associates, Inc. v. ANC Holdings*, 754 F. Supp. 37, 39 (S.D.N.Y. 1991).

In the present matter, the Court finds that Plaintiffs are entitled to summary judgment as to Defendant SLI's unjust enrichment counterclaim.  Since the claims Plaintiffs brought against Defendants are excepted from the General Releases, a valid contract exists governing the same subject matter.  As such, under New York law, Defendant SLI's unjust enrichment counterclaim must be dismissed.  *See Xiotech Corp. v. Express Data Products Corp.*, 11 F. Supp. 3d 225, 242 (N.D.N.Y. 2014); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (citation omitted); *see also* Dkt. No. 73 at 5 n.1 (acknowledging that, "if the Court finds that the General Release Agreements are valid and binding contracts, dismissal of SLI's alternative unjust enrichment Counterclaims is proper").

Based on the foregoing, the Court grants Plaintiffs' motion for partial summary judgment as to Defendants unjust enrichment counterclaim.


## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for partial summary judgment is **GRANTED** (Dkt. No. 65)**;** and the Court further

**ORDERS** that Defendants' First and Second Counterclaims, as well as their First and Eighth Affirmative Defenses are **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment is **DENIED** (Dkt. No. 67); and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2015
        Albany, New York

Mae A. D'Agostino
U.S. District Judge