**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**CLIFFORD P. BEEDE, SHERRY E. HALLIGAN,**
**EILEEN MOTTL, and CATHERINE G. WEEKS,**

               **Plaintiffs/Counter Defendants,**

    **vs.**                        **1:13-cv-120**
                                      **(MAD/DJS)**

**STIEFEL LABORATORIES, INC. and CHARLES**
**W. STIEFEL,**

               **Defendants/Counter Claimants.**

_____

**APPEARANCES:**               **OF COUNSEL:**

**FREEMAN HOWARD, PC**       **MATTHEW J. GRIESEMER, ESQ.**
441 East Allen Street             **PAUL M. FREEMAN, ESQ.**
P.O. Box 1328
Hudson, New York 12534
Attorneys for Plaintiffs/Counter
Defendants

**GREENBERG TRAURIG LLP**     **DAVID COULSON, ESQ.**
333 SE 2nd Avenue              **HILARIE BASS, ESQ.**
Miami, Florida 33131           **LINDSEY EDELMANN, ESQ.**
Attorneys for Defendants/Counter  **TODD D. WOZNIAK, ESQ.**
Claimants                    **CYNTHIA E. NEIDL, ESQ.**

**SCHOEMAN, UPDIKE, KAUFMAN &**  **BETH L. KAUFMAN, ESQ.**
**STERN, LLP**                  **PAULETTE J. MORGAN, ESQ.**
551 Fifth Avenue
New York, New York 10176
Attorneys for Defendants/Counter
Claimants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On January 13, 2013, Plaintiffs commenced this federal question action alleging securities fraud, breach of fiduciary duty and violations of the Employee Retirement Income Security Act of 1974 ("ERISA").  *See* Dkt. No. 1.  Pursuant to a stipulation of partial voluntary dismissal dated January 21, 2015, Plaintiffs dismissed the following counts: (1) Count 2 alleging violations of ERISA Section 404 (29 U.S.C. § 1104); (2) Count 3 alleging violations of ERISA Section 405(a) (29 U.S.C. § 1105(a)); and (3) Count 4 alleging violations of ERISA Sections 406, 408 (29 U.S.C. §§ 1106, 1108).  *See* Dkt. No. 78.  As a result of the stipulation of voluntary dismissal, Plaintiffs' only remaining claim is one for securities fraud pursuant to 15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934 against Defendants Stiefel Laboratories, Inc. ("Stiefel Labs" or "SLI") and Charles Stiefel.  *See id.*; *see also* Dkt. No. 1 at ¶¶ 125-144.

Currently before the Court are the following motions: (1) Plaintiffs' motion for summary judgment (Dkt. Nos. 81-85); (2) Plaintiffs' *Daubert* motion to exclude and preclude the testimony of Defendants' purported experts, Lance T. Studdard and Chester Gougis (Dkt. No. 86); and (3) Defendants' motion *in limine* to exclude the expert testimony of Daniel Reser (Dkt. No. 89).

## II. BACKGROUND

**A.     The parties**

Defendant Stiefel Labs is a Delaware Corporation with its principal place for the transaction of business located at 20 TW Alexander Drive, Research Triangle Park in the State of North Carolina.  *See* Dkt. No. 85 at ¶ 1.  Prior to July 22, 2009, Stiefel Labs owned and maintained a manufacturing facility in the Hamlet of Oak Hill, Town of Durham, County of Greene, in the State of New York.  *See id.* at ¶ 2.  On April 20, 2009, British Company

GlaxoSmithKline, PLC ("GSK") executed an initial agreement to acquire Stiefel Labs, and the acquisition closed on July 22, 2009. *See id.* at ¶ 3. Stiefel Labs is now an affiliate and wholly-owned subsidiary of GSK. *See id.* at ¶ 4.

Prior to its acquisition by GSK, Stiefel Labs was the world's largest independent pharmaceutical company specializing in dermatology with annual sales at its peak of over $900 million and thousands of employees. *See id.* at ¶ 5. Defendant Stiefel Labs had been privately held, owned in large part by the Stiefel family, for its entire 162-year history, until it merged with GSK in 2009. *See id.* at ¶ 6; *but see* Dkt. No. 101 at ¶ 6.

Prior to Stiefel Labs' acquisition by GSK, Defendant Charles W. Stiefel served as Stiefel Labs' Chief Executive Officer, Chairman of the Board of Directors, a member of the Board's compensation and executive committees, and had control over various aspects of Stiefel Labs. *See id.* at ¶ 8. At the time of the merger with GSK, Defendant Charles Stiefel owned approximately 10% of Stiefel Labs' outstanding common stock, and 90% of its Class B shares, which empowered him to appoint six of the nine directors to SLI's Board. *See id.* at 9.

Prior to SLI's acquisition by GSK, Brent Stiefel served as SLI's Executive Vice President, a member of the Board of Directors, and was a member of the Board's compensation and executive committees. *See id.* at ¶ 10. Prior to SLI's merger with GSK, Todd Stiefel served as SLI's Executive Vice President of Global Strategy, a member of the Board of Directors, and was a member of the Board's compensation and executive committees. *See id.* at ¶ 11. Moreover, prior to the merger, Stephen Karasick served as SLI's Senior Vice President of People and Technology, while Michael Cornelius served as SLI's Chief Financial Officer and Matt S. Pattullo served as SLI's Senior Vice President and was responsible for Human Resources. *See id.* at ¶¶ 12-14.

Until his termination from employment, Plaintiff Clifford Beede was employed by Defendant SLI and then by GSK at Oak Hill for more than thirty (30) years, most recently serving as Senior Scientist. *See* Dkt. No. 85 at ¶ 15. Plaintiff Beede was terminated as an employee of GSK on June 28, 2011. *See id.* at ¶ 16.

Until her termination from employment, Plaintiff Sherry Halligan was employed by SLI and then by GSK at Oak Hill for more than twenty-three (23) years, most recently serving as a Senior Associate. *See id.* at ¶ 17. Plaintiff Halligan was terminated as an employee of GSK on December 7, 2011. *See id.* at ¶ 18.

Until her termination from employment, Plaintiff Eileen Mottl was employed by SLI and then by GSK at Oak Hill for more than thirteen (13) years, most recently serving as Scientist. *See id.* at ¶ 19. Plaintiff Mottl was terminated as an employee of GSK in July of 2012. *See id.* at ¶ 20.

Until her termination from employment, Plaintiff Catherine Weeks was employed by SLI and then by GSK at Oak Hill for twenty-six (26) years, most recently serving as a personal Grade 8 Employee. *See id.* at ¶ 21. Plaintiff Weeks was terminated as an employee on December 30, 2011. *See id.* at ¶ 22.

**B.     The Blackstone Transaction**

On July 31, 2007, Blackstone Healthcare Partners, LLC ("Blackstone") made an offer to purchase an interest in SLI. *See* Dkt. No. 84-1 at Ex. 95. On August 7, 2007, Defendant Charles Stiefel consented to a transaction with Blackstone for an investment of $500,000,000 by Blackstone in which Blackstone would acquire new convertible preferred shares of SLI. *See id.*; *but see* Dkt. No. 101 at ¶ 24. On August 9, 2007, Defendant Charles Stiefel announced the Blackstone Transaction to SLI employees. *See* Dkt. No. 84-1, Ex. 98. In the email announcing the transaction, Defendant Charles Stiefel stated as follows: "Stiefel will continue to be a privately

held company operating under my direction as Chairman, Chief Executive Officer, and President. The Stiefel family will continue to hold a majority-share ownership in the company. Blackstone will be a minority investor in Stiefel Laboratories and have one seat on the company's board of directors." *Id.* Charles Stiefel also stated in a Frequently Asked Questions attachment that "[t]here are currently no plans for Stiefel to become a publicly traded company. Blackstone will have a defined exit arrangement with Stiefel at the end of eight years." Dkt. No. 84-1, Ex. 98 at SLI-8-000724.

## C.     The SLI Employee Stock Bonus Plan ("ESBP")

SLI established an Employee Stock Bonus Plan ("ESBP" or the "Plan") in 1975, through which the company annually provided shares of SLI common stock and/or cash to its employees as part of their compensation and for their retirement. *See* Dkt. No. 85 at ¶ 27. The ESBP was managed by a Trustee and a Plan Committee. *See id.* at ¶ 28. Pursuant to Section 9.1 of the Plan titled "The Committee," the Committee was provided with the following powers:

> The exclusive responsibility and authority to control and manage the operation and administration of the Plan, except to the extent such responsibility and authority are otherwise specifically (i) allocated to the Disability Review Board, the Company or the Trustee under the Plan or the Trust Agreement, (ii) delegated to other persons by the Committee or (iii) allocated to other parties by operation of law, shall be vested in the Committee. The Committee also shall be the "plan administrator" within the meaning of ERISA.

Dkt. No. 85 at ¶ 28.

Defendant Charles Stiefel served as the Plan Trustee from August 13, 2001 until October 22, 2008. *See id.* at ¶ 29. He also served on the ESBP Committee during the time he served as Plan Trustee. *See id.* Stephen Karasick replaced Charles Stiefel as successor Trustee to the Plan on October 20, 2008. *See id.* at ¶ 30; *see also* Dkt. No. 84-1, Ex. 38 at SLI-2-000487-488.

Charles Stiefel continued to serve on the ESBP Committee and continued as CEO of SLI after Stephen Karasick became Trustee to the Plan. *See id.*

Between 2000 and 2008, Stiefel Labs contributed both shares of stock and cash into their employees ESBP accounts. *See* Dkt. No. 83-3 at 12-16. In 2008, SLI contributed only cash to the ESBP. *See id.* at 13. Employees of SLI were sent annual valuation statements of their ESBP account, which would include the value of the shares. *See id.* at 12-16. Every year, Stiefel Labs hired an independent appraiser to appraise the value of company shares. *See id.* at 14. When an employee would put his shares back to the company, SLI was required to pay the appraised value of the stock. *See id.* SLI's fiscal year ends on March 31, and the appraised value of the company shares would not be available until sometime in October or November. *See id.* Participants in the Plan were unable to get a distribution from their account until SLI received the appraised value of the company shares. *See id.* at 15.

The price per share of the ESBP was typically announced by Charles Stiefel in an email to all United States employees of Stiefel Labs. *See* Dkt. No. 85 at ¶ 32. The appraiser who set the stock price in 2008 was named Terrence Bogush of the firm Bogush & Grady, LLP. *See id.* at ¶ 33; *see also* Dkt. No. 83-3 at 14, 31. On August 31, 2008, Mr. Bogush issued his report valuing the ESBP shares as of March 31, 2008 in the amount of $16,469 per share. *See id.* at ¶ 34. On October 14, 2008, Defendant Charles Stiefel announced to SLI employees the share price for the ESBP of $16,469 per share. *See id.* at ¶ 35.

The Plan provided certain "put" rights to its participants. *See id.* at ¶ 36. Pursuant to § 7.6 of the Plan, titled "Option to Have Company Purchase Bonus Stock," a qualifying participant "shall have the right to require the Company to purchase the Bonus Stock for its current fair market value (as determined pursuant to Treas. Reg. Section 54.4975-11(d)(5))." *Id.* Prior to

November 2008, an eligible Plan participant could, upon the occurrence of a "qualifying event" as set forth in Section 7 of the Plan, request a distribution of the stock held in their ESBP account under the terms of the ESBP. *See id.* at ¶ 37; *see also* Dkt. No. 84-1, Ex. 32 at SLI-2-000199. Qualifying events included death, termination of employment, or retirement. *See id.*

On April 17, 2008, Defendant Charles Stiefel agreed to amend the Plan to merge the 401(k) with the ESBP and to limit the windows for participants to elect diversification (the "First Plan Amendment"). *See* Dkt. No. 85 at ¶ 38; Dkt. No. 84-1, Ex. 102 at SLI-11-018497. On May 29, 2008, the SLI Board of Directors approved the First Plan Amendment, effective June 1, 2008. *See id.* at ¶ 39;[1] Dkt. No. 84-1, Ex. 32 at SLI-2-000226.

On September 26, 2008, the Company made a second amendment to the Plan, effective October 1, 2008, that would "give the Committee the discretion to grant additional diversification rights under the Plan[.]" Dkt. No. 85 at ¶ 40. The Second Plan Amendment added a new Section 7.13 to the Plan, which read as follows:

> The Committee may, in addition to the diversification rights provided under Section 7.12 in accordance with Code Section 401(a)(28), permit Participants to elect, in such amounts and upon such other terms and conditions as the Committee may establish from time to time in its sole discretion, to invest their Bonus Stock Account in one or more investment options designated by the Committee (other than Bonus Stock). The Committee may, to the extent it deems necessary or appropriate to comply with any applicable limits or otherwise, apply any diversification limits or

---

[1] In their response to Plaintiffs' statement of material facts, "Defendants object to this statement on the ground that it is not supported by the evidence cited." Dkt. No. 101 at ¶ 39. Upon review of the record cited, it is clear that Plaintiffs' statement is in fact supported by the evidence cited. *See* Dkt. No. 84-1, Ex. 32 at SLI-2-000226-000228. Defendants have repeatedly objected to statements of fact on this ground, yet provide no citation to the record in support of their objection, in violation of Local Rule 7.1(a)(3). Rule 7.1 specifically provides that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

> rights established under this Section on a pro-rata or other
> reasonable nondiscriminatory basis.

*Id.* For the first time in SLI history, the Second Plan Amendment afforded eligible Plan

participants (those who had vested) a new opportunity called "optional diversification" that

allowed eligible participants to elect a distribution of the stock held in the ESBP accounts without

a qualifying event. *See id.* at ¶ 41.

On October 29, 2008, Defendant Charles Stiefel emailed all SLI employees with the

opening line "'[i]t was the best of times, it was the worst of times,' wrote Charles Dickens, and it

seems that this applies pretty well to the current success of Stiefel amidst the immense economic

challenges grabbing media headlines." *Id.* at ¶ 42.[2] Charles Stiefel further stated that SLI is "very

healthy right now" and that it is "only prudent for us to take measured steps to protect our future

while continuing to invest and grow in our company. . . . I look forward to . . . working with each

of you to make sure that the next three years are as successful and responsible as the past three."

*Id.* On November 19, 2008, Defendant Charles Stiefel emailed employees announcing a

temporary austerity program and noted that "our future continues to look extremely bright." *Id.* at

¶ 43.

On November 19, 2008, Gary Jellum released an email communication to SLI employees

and Plan participants encouraging them to review "vitally important and time sensitive

information" relating to the merger of the 401(k) and the ESBP and a new Optional

Diversification opportunity to give employees "more control, flexibility, and opportunity." *Id.* at ¶

---

[2] Again, "Defendants object to the first sentence in this paragraph because it is not supported by a citation to record evidence required by Local Rule 7.1(a)(3)." Dkt. No. 101 at ¶ 42. Following the second sentence in this paragraph, Plaintiffs provided a citation to record evidence that supports both the first and second sentence of this numbered paragraph. *See* Dkt. No. 85 at ¶ 42.

44.  Mr. Jellum's email explained that, "for the first time ever," Plan participants would have an opportunity to request diversification of all or a portion of the Company stock in the ESBP accounts.  *See id.* at ¶ 45.  On November 21, 2008, Mr. Jellum sent a packet to all ESBP participants announcing to employees that the shares of Company stock selected to diversify will be sold to the Company based on the most recent stock price of $16,469 per share.  *See id.* at ¶ 46.  Mr. Jellum stated in his communication that "Stiefel is providing employees with a broad array of investment options for long-term financial security and ensuring that employees have greater flexibility and access to their ESBP account."  *Id.*  Mr. Jellum also announced that the first diversification window would be open from February 1, 2009 through March 1, 2009, and expressly cautioned that "[d]iversification requests will be pro-rated based on all requests and available funds."  *Id.*

On December 19, 2008, Mr. Jellum announced to Plan participants that the diversification window would be moved up to January 12, 2009 through February 2, 2009 to "maximize fulfillment potential."  *Id.* at ¶ 47.  On January 2, 2009, packets were mailed to ESBP participants eligible for optional diversification with a cover letter stating that the window to submit a diversification request is from January 12, 2009 through February 2, 2009.  *See id.* at ¶ 48.  Participants were also notified and expressly warned that

> [a]ll requests made during the diversification window will be reviewed at the end of the diversification period.  This is done to ensure that the total amount requested doesn't exceed the amount available for diversification.  There is always a possibility that diversification requests cannot be fulfilled or that they will be fulfilled at some percentage of what was requested.  If the requests exceed the limits available, all participants who submitted diversification requests will be notified of the reduced or denied election.

*Id.* at ¶ 49.

On January 11, 2009, Defendant Charles Stiefel allocated $10,000,000 for the purpose of undertaking ESBP share repurchases, which included $2,000,000 earmarked specifically for Optional Diversification share buy-backs. *See id.* at ¶ 50.[3] On January 27, 2009, Gary Jellum emailed ESBP participants eligible for optional diversification and indicated that diversification requests must be received by February 2, 2009. *See id.* at ¶ 51. Additionally, Plan participants were forewarned as follows: "Please be mindful diversification of company stock may be limited within a plan year. Therefore, there is always a possibility that diversification requests cannot be fulfilled or that they will be fulfilled at some percentage of what was requested. Any reduction is proportionately applied across all requests." *Id.*

On November 26, 2008, the day before Thanksgiving and five days after optional diversification was first announced to SLI employees, Charles W. Stiefel, Brent Stiefel and Todd Stiefel held their annual family meeting to discuss SLI. *See* Dkt. No. 85 at ¶ 52; Dkt. No. 94, Ex. 110. Following the meeting Charles W. Stiefel emailed Anjan Mukherjee at Blackstone to ask about "a concept that has always been taboo in the past – the concept of selling the company." *Id.* Charles W. Stiefel asked Anjan Mukherjee what kind of price SLI would command. *See id.*

At 7:43pm on November 26, 2008, Charles Stiefel emailed Brent Stiefel and Todd Stiefel following a phone call with Anjan Mukherjee at Blackstone stating that Blackstone advised that SLI should be sold "right now or wait 5 years." Dkt. No. 85 at ¶ 53. Blackstone further advised that the price Blackstone paid for its shares in 2007 ($60,407) would "serve as a floor." *Id.* Charles Stiefel also notes that Blackstone "think[s] that it is possible that we could get someone to

---

[3] The Court notes Defendants' objection to this statement and direct their attention to the material Plaintiffs have cited, which fully supports their assertion. *See* Dkt. No. 85 at ¶ 50 (citations omitted).

pay 3-5 times sales." *Id.* At that time, annual sales at SLI were $907,574,139. *See id.* At 7:49pm, Brent Stiefel emailed Todd Stiefel and Charles Stiefel and stated, "I vote we move on this right now as 5 years poses a fair amount of risk. . . . I am excited by this proposition. Could you imagine getting 4-5 times sales?" *Id.* at ¶ 54. Charles Stiefel responded to Brent Stiefel and Todd Stiefel and stated "it would be awesome." *Id.* At 7:57pm on November 26, 2008, Charles Stiefel emailed Chinh Chu and Anjan Mukherjee at Blackstone to inform them that Todd Stiefel, Brent Stiefel and Charles Stiefel are "ready to move forward exactly as you suggest." *Id.* at ¶ 55. Charles Stiefel stated, "I forgot to mention one other factor that caused us to consider selling now. I fear that the Obama administration will move to increase the tax rate on capital gains, so selling before that happens would result in considerably more after-tax dollars." *Id.* At 8:08pm on November 26, 2008, Todd Stiefel emailed Charles Stiefel and Brent Stiefel and stated, with respect to the sale of the company, "I agree with BD [Brent Stiefel]. Let's start moving." *Id.* at ¶ 56.

On December 8, 2008, Blackstone prepared and sent Charles W. Stiefel discussion materials for a meeting between Blackstone and SLI about a sales process. Dkt. No. 85 at ¶ 57. In the discussion materials, Blackstone indicated that it understands that SLI has begun to consider a potential change-of-control transaction. *Id.* Blackstone estimated that the time to sign a definitive agreement with an acquiror is three-to-four months. *See id.* Blackstone also included a timeline which estimated that SLI will receive final bids, select a bidder and announce the transaction by March 17, 2009. *See id.* The discussion materials include a tier of potential buyers including Tier I (large cap dermatology) Sanofi Aventis and Tier II (large cap pharma) GSK. *See id.* As a valuation consideration, Blackstone indicated that specialty pharmaceutical transactions

have historically been completed at an average last twelve months (LTM) revenue multiple of 3.6x. *See id.*

On December 8, 2008, after discussing figures sent by Blackstone with sale price ranges from $2.25 to $4 billion, Brent D. Stiefel stated in an e-mail with Anjan Mukerjee of Blackstone and Charles W. Stiefel that, "to me, we have a lot to offer and anything below $3 billion would seem like we are selling at bargain prices." *Id.* at ¶ 58. Brent Stiefel reiterated in his deposition that his belief at that time was that $3 billion was a "floor" sales price. *See id.* He also testified that he never relayed this information to Stephen Karasick or to Terrence Bogush. *See id.* Further, Brent Stiefel affirmed that in January and February of 2009, he would never have agreed to sell SLI to an possible acquiror for $16,469 per share, the value SLI used to purchase ESBP stock, because that price was too low. *See id.*[4]

On December 22, 2008, Charles Stiefel emailed Todd Stiefel and Brent Stiefel regarding a meeting he had with Chris Viehbacher, CEO of Sanofi-Aventis that day. *See* Dkt. No. 85 at ¶ 59. Charles Stiefel stated that Chris Viehbacher would be interested in exploring a purchase of SLI

---

[4] Defendants again object to the last statement of this paragraph "because it misrepresents Brent Stiefel's testimony and contains an improper valuation comparison." Dkt. No. 101 at ¶ 58. During his deposition testimony, Brent Stiefel was asked the following question and provided the following answer:

> Q. Would you have considered selling the company for $16,469 a share during that window?
>
> A. I believe that's the same question you just asked me in a different way. And the answer is no because there would have been no money at all for any shareholders outside of Blackstone and there would have been some money for our bankers, and everybody else would have received zero.

Dkt. No. 83-1 at 7.

and further indicated that he was "excited to move forward." *Id.* On the same day, December 22, 2008, Todd, Brent and Charles Stiefel re-named the sales process "Project Jump," which was previously referred to as "Project Knox." *Id.* On December 29, 2008, Todd Stiefel sent an email to Brent and Charles Stiefel suggesting that they use the code name "Jupiter" when referring to SLI for the Project Jump sales process "because we are about the biggest derm company money can buy! It also implies they will have to pay a jumbo price tag." *Id.* at ¶ 60.

On January 1, 2009, SLI, through Defendant Charles Stiefel, retained Blackstone to "provide financial advisory services to the Company in connection with a Transaction and [to] assist the Company in analyzing, structuring, negotiating and effecting the Transaction[.]" Dkt. No. 94, Ex. 121 at BX-Stiefel 0018358-0018364. Effective on the same day, three-year employment contracts were awarded by the Compensation Committee to several SLI executives, including Charles, Brent and Todd Stiefel. *See* Dkt. No. 94, Exs. 146-148.

On January 11, 2009, Charles Stiefel, acting in his capacity as CEO of SLI, approved Stephen Karasick's request to allocate $2,000,000 for use in buying back employee stock under Optional Diversification. *See* Dkt. No. 85 at ¶ 62. On January 21, 2009, Charles Stiefel signed a confidentiality agreement with Sanofi-Aventis regarding information transmitted pertaining to a potential purchase of Stiefel. *See id.* at ¶ 65; Dkt. No. 95, Ex. 205. On January 29, 2009, Charles Stiefel signed a confidentiality agreement with Johnson & Johnson regarding information transmitted pertaining to a potential purchase of Stiefel. *See id.* at ¶ 66; Dkt. No. 94, Ex. 230.

Plaintiffs Beede, Halligan, Mottl and Weeks were all SLI employees and Plan participants with vested shares in the Plan at the time of SLI's first-ever Optional Diversification period in early 2009. *See* Dkt. No. 85 at ¶ 67. Unaware of Project Jump, on or about January 25, 2009, Plaintiff Mottl requested diversification of 1.765627 of her shares of ESBP stock. *See id.* at ¶ 68.

Also unaware of Project Jump, on or about January 26, 2009, Plaintiff Weeks requested diversification of 14.837672 of her shares of ESBP stock. *See id.* at ¶ 70. Similarly, on or about January 28, 2009, Plaintiff Beede requested diversification of 19 of his shares of ESBP stock and on January 29, 2009, Plaintiff Halligan requested diversification of 3 of her shares of ESBP stock. *See id.* at ¶¶ 72, 74.

On January 30, 2009, Matt Pattullo emailed Stephen Karasick and Michael Cornelius and recommended satisfying up to 100% of the additional requests for optional diversification, which totaled approximately $5.4 million, with the total for distributions and diversifications at $13 million. *See* Dkt. No. 85 at ¶ 76; Dkt. No. 101 at ¶ 76; Dkt. No. 94, Ex. 69 at SLI-18-0046. That same day, Charles Stiefel, as CEO of SLI, agreed to settle all Optional Diversification requests and emailed Stephen Karasick approving the allocation of an additional sum of money, bringing the total to approximately $14,000,000 to settle all diversification requests. *See id.* at ¶ 78; Dkt. No. 94, Ex. 40 at SLI-18-0038–0041. Also on January 30, 2009, Michael Cornelius emailed Todd Stiefel that the recommendation to max out all requests is "caveated due to jump" but could not let Matt Pattullo or Stephen Karasick know because they were unaware of Project Jump at the time. *See id.* at ¶ 80; Dkt. No. 101 at ¶ 80. Michael Cornelius asked if Todd Stiefel would get approval from Charles Stiefel to max out and accept all requests for optional diversifications. *See id.* As of February 2, 2009, Charles Stiefel, Todd Stiefel, Brent Stiefel, Bill Humphries, Gavin Corcoran, Michael Cornelius, Robin Vandekreeke, Martin Floreani, Devin Buckley, Stephen Karasick and Matt Pattullo knew about Project Jump. *See id.* at ¶ 81.

On February 3, 2009, Charles W. Stiefel signed a confidentiality agreement with Allergan pertaining to any information regarding its potential purchase of SLI. *See id.* at ¶ 82.

On February 5, 2009, Charles Stiefel emailed Brent Stiefel and Todd Stiefel about increasing his compensation and stated:

> I don't think we should do this at this time because of Project Jump. It would look really bad to have my 2 sons award me a whole bunch of additional stock right before a sale of the company at a stock price many times the price used to calculate my stock. This might be a windfall for me, but none of us need or want the potential scrutiny or maybe even lawsuits.

Dkt. No. 85 at ¶ 83.

On February 5, 2009 at 4:36pm, Charles Stiefel responded to an email request to put a communication plan in place regarding Project Jump in the event there is a public "leak," which provided as follows: (1) "not announce anything to our employees and unnecessarily scare them unless and until we enter into a binding contract;" (2) "If someone hears a rumor and inquires about it, we respond: a) companies have been expressing interest in acquiring us for decades. b) we like being private and independent. c) If a company makes a compelling offer, however, we have a fiduciary duty to our shareholders to at least listen to the offer. d) In 162 years of business, no one has yet made an offer that the family wanted to accept." *Id.* at ¶ 84.

On February 6, 2009, Todd Stiefel provided "tiers" of candidates for Project Jump and stated that the top candidates for Project Jump include Sanofi-Aventis and GSK, the ultimate purchaser. *See id.* at ¶ 85. On February 10, 2009, at the request of Brent Stiefel, Whit Knier from Blackstone emailed Brent Stiefel a copy of the latest timeline and work plan prepared by Blackstone which provided that initial bids would be received by mid-March and that the expected execution of a definitive agreement with selected acquiror would likely occur in April of 2009. *See* Dkt. No. 85 at ¶ 86.

On February 12, 2009, Matt Pattullo emailed the "final tally" for the ESBP changes. *See id.* at ¶ 87. Pattullo noted a "5.1% reduction in outstanding shares and a 31.4% reduction in ESBP holdings." *Id.* On February 13, 2009, Charles Stiefel emailed Todd and Brent Stiefel and stated that hopefully by mid-May 2009 "we will either have closed or be just awaiting FTC approval." *Id.* at ¶ 88.

On February 13, 2009, Todd Stiefel emailed all that knew about Project Jump providing the following "Rumor Response":

> We have heard that there is a rumor in the banking community that Stiefel is for sale. If you are asked about anyone in banking, derm or our company, here is the response you should give:
>
> > -blow it off as if it is not an issue or as if it is plain silly
> >
> > - say there are [sic] have been such rumors for really as long as we can remember
> >
> > - say that there is probably just confusion because we are shopping around a bunch of pipeline projects that are not core focuses for us that we gained in the Barrier acquisition and that we are also shopping around some current brands that are not a commercial focus.

Dkt. No. 85 at ¶ 89. Todd Stiefel continued by saying that, "if push comes to shove . . . flatly deny if necessary." *Id.*

On or about February 13, 2009, Plaintiff Beede received $16,469 per share of the 19 shares of ESBP stock from SLI for which he requested optional diversification from SLI. *See id.* at ¶ 90. On or about February 13, 2009, Plaintiff Halligan received $16,469 per share of the 3 shares of ESBP stock from SLI for which she requested optional diversification from SLI. *See id.* at ¶ 91. On or about February 13, 2009, Plaintiff Mottl received $16,469 per share of the 1.765627 shares of ESBP stock from SLI for which she requested optional diversification from SLI. *See id.* at ¶

92.  On or about February 13, 2009, Plaintiff Weeks received $16,469 per share of the 7 shares of

ESBP stock from SLI for which she requested optional diversification from SLI.  *See id.* at ¶ 93.

On February 14, 2009, one day after the payments were made to ESBP participants who

elected optional diversification, Brent Stiefel prepared a payout schedule showing how much

money Charles, Brent and Todd Stiefel, and Brent and Todd's children could receive as a result of

the sale of the company.  *See id.* at ¶ 94.[5]  On February 17, 2009, Brent Stiefel emailed

representatives at Blackstone asking for the latest timeline.  *See id.* at ¶ 96.  Blackstone provided

the timeline, and Brent Stiefel forwarded it to Todd and Charles Stiefel confirming that the sale

process was still on schedule.  *Id.*  With the exception of a one-month delay, the sales process

schedule remained consistent throughout Project Jump.  *See id.*

On February 18, 2009, Brent Stiefel emailed Todd and Charles Stiefel with an updated

payout schedule of what Charles, Brent and Todd Stiefel would receive as a result of a sale of the

company.  *See* Dkt. No. 85 at ¶ 97.  Again, the payout schedule specifically included a potential

sale price of $3.5 billion.  *See id.*  On February 20, 2009, Brent Stiefel calculated and sent to Todd

and Charles Stiefel a third version of the payout schedule showing the difference between what

Charles, Todd and Brent Stiefel as well as Todd and Brent Stiefel's children would receive

pre-ESBP buyback and post-ESBP buyback on a spreadsheet with a per share price of $68,000 per

share.  *See id.* at ¶ 98.  Brent Stiefel stated that "[i]t is nice to see the $ go up for all of us!"  *Id.*

On the same day, February 20, 2009, Brent Stiefel emailed those who knew about Project Jump a

"cover story" to use "if we get questions or push-back."  *Id.* at ¶ 99.

---

[5] The Court notes that Defendants assert that this "chart was created to determine at what
price point Blackstone's veto right would be eliminated."  Dkt. No. 101 at ¶ 94.

Following management presentations attended by Charles Stiefel, Bill Humphries, Todd Stiefel, Brent Stiefel, Gavin Corcoran, Mike Cornelius and Devin Buckley on behalf of SLI and GSK and Sanofi-Aventis held on February 17, 2009, Blackstone submitted acquisition proposals to GSK and Sanofi-Aventis, bids being due March 24, 2009. *See id.* at ¶ 100; Dkt. No. 94, Exs. 136-137, 225.

On March 19, 2009, SLI executives became aware of a Wall Street Journal Article expected to come out on March 20, 2009, announcing that SLI is for sale. *See* Dkt. No. 85 at ¶ 101; Dkt. No. 94, Ex. 185. In an email exchange on March 19, 2009 regarding the expected article, Todd Stiefel noted that "[o]ur employees will be getting calls from random friends, and again we want them all to have heard from us beforehand so that they are not blindsided." Dkt. No. 85 at ¶ 102. As anticipated, on March 20, 2009, the Wall Street Journal announced that SLI was considering selling itself. *See id.* at ¶ 103.

On March 24, 2009, Sanofi-Aventis submitted a proposal to acquire Stiefel Labs for an enterprise value of $3.2 billion, while GSK submitted a proposal to acquire Stiefel Labs for an enterprise value of $3.5 billion. *See id.* at ¶ 104. On April 16, 2009, GSK submitted a second proposal to acquire Stiefel Labs for a value of up to $3.6 billion. *See id.* at ¶ 105.

On April 20, 2009, for the first time, Charles Stiefel announced to employees, including Plaintiffs, that SLI had agreed to be acquired by GSK in a cash transaction valued at up to $3.6 billion expected to be completed within six (6) months upon United States and European Union regulatory approval. *See* Dkt. No. 85 at ¶ 106. On December 16, 2009, SLI updated its March 31, 2009 ESBP stock valuation from $16,469 per share to $48,402 per share. *See id.* at ¶ 107.

On January 13, 2013, Plaintiffs commenced this federal question action alleging securities fraud, breach of fiduciary duty and violations of the Employee Retirement Income Security Act of

1974 ("ERISA"). *See* Dkt. No. 1. Pursuant to a stipulation of partial voluntary dismissal dated January 21, 2015, Plaintiffs dismissed the following counts: (1) Court 2 alleging violations of ERISA Section 404 (29 U.S.C. § 1104); (2) Count 3 alleging violations of ERISA Section 405(a) (29 U.S.C. § 1105(a)); and (3) Count 4 alleging violations of ERISA Sections 406, 408 (29 U.S.C. §§ 1106, 1108)). *See* Dkt. No. 78. As a result of the stipulation of voluntary dismissal, Plaintiffs' only remaining claim is one for securities fraud pursuant to 15 U.S.C. §§ 78j and 78t of the Securities and Exchange Act of 1934 against Defendants Stiefel Laboratories, Inc. and Charles Stiefel. *See id.*; *see also* Dkt. No. 1 at ¶¶ 125-144. In a September 30, 2015 Memorandum-Decision and Order, the Court granted Plaintiffs' motion for partial summary judgment, dismissing Defendants' counterclaims alleging breach of contract and unjust enrichment. *See* Dkt. No. 117. Further, the Court denied Defendants' motion for partial summary judgment, rejecting Defendants' arguments that the claims against them are precluded because of General Lease Agreements Plaintiffs executed upon their termination from employment. *See id.*

Currently before the Court are the following motions: (1) Plaintiffs' motion for summary judgment (Dkt. Nos. 81-85); (2) Plaintiffs' *Daubert* motion to exclude and preclude the testimony of Defendants' purported experts, Lance T. Studdard and Chester Gougis (Dkt. No. 86); and (3) Defendants' motion *in limine* to exclude the expert testimony of Daniel Reser (Dkt. No. 89).

### III. DISCUSSION

**A.     Plaintiffs' motion for summary judgment**

In their motion for summary judgment, Plaintiffs argue that they are entitled to summary judgment on the issue of whether Defendants Charles Stiefel and SLI made a false statement or omission of a material fact by failing to update Plaintiffs regarding the ongoing merger/sale negotiations. *See* Dkt. No. 81-1 at 10-22. Specifically, Plaintiffs contend that the issue has

already been fully and fairly litigated in an action brought in the Southern District of Florida and, therefore, collateral estoppel should preclude Defendants from re-litigating this issue. *See id.* (citing *Finnerty v. Stiefel Laboratories, Inc.*, 756 F.3d 1310 (11th Cir. 2014)). Similarly, Plaintiffs contend that they are entitled to summary judgment on the issue of whether Defendants acted "knowingly" when they failed to update Plaintiffs regarding the ongoing merger/sale because the issue was already decided in the *Finnerty* action. *See id.* at 22-24. Plaintiffs also argue that collateral estoppel applies to the issue of whether they justifiably relied on Defendants false representations of material fact when they elected to "put" their shares to SLI. *See id.* at 24-26. Finally, Plaintiffs assert that they are entitled to partial summary judgment on the issue of whether Defendants had a duty to disclose the material information regarding the potential sale of SLI at the time of Plaintiffs' election to sell their ESBP shares or, at a minimum, to abstain from purchasing those shares

## 1. Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the

nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Collateral estoppel

"The doctrine of collateral estoppel prevents a plaintiff from relitigating in a subsequent proceeding an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002)). Collateral estoppel is permitted if "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (internal quotation marks omitted). Importantly, "[t]hese four factors are required but not sufficient." *Bear, Stearns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005).

Additionally, where, as here, the plaintiff seeks to employ collateral estoppel offensively, the court must also "satisfy itself that application of the doctrine is fair." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979)). "'Allowing offensive collateral estoppel may . . . be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the

defendant.'" *Bear Stearns*, 409 F.3d at 91 (quotation omitted). "An instructive hypothetical is propounded in *Parklane Hosiery*: if a railway accident injured 50 people, and the first 25 people who sued the railroad lost, and the 26th person won, the remaining plaintiffs ought not be able to win by estoppel." *Id.* (citing *Parklane Hosiery*, 439 U.S. at 330 n.14, 99 S. Ct. 645) (other citation omitted). "If 'application of offensive estoppel would be unfair to a defendant,' for this or several other reasons, the doctrine should not be applied." *Id.* (quoting *Parklane Hosiery*, 439 U.S. at 331, 99 S. Ct. 645).

### 3. Elements of claims under Section 10(b) and Rule 10b-5

"Section 10(b) of the Exchange Act prohibits any person from using or employing 'any manipulative or deceptive device or contrivance in contravention' of SEC rules." *In re Fannie Mae 2008 Securities Litig.*, 891 F. Supp. 2d 458, 469 (S.D.N.Y. 2012) (quoting 15 U.S.C. § 78j(b)). "Rule 10b-5 prohibits 'any device, scheme, or artifice to defraud' and 'any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading. . . .'" *Id.* (quoting 17 C.F.R. § 240.10b-5). To set forth a claim under Rule 10b-5, the plaintiffs must establish that the defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" *Id.* at 469-70 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

A claim brought under Rule 10b-5 must fail if it relies on statements or omissions "that a reasonable investor would [not] have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "An omitted fact may be immaterial if the information is trivial, . . . or is so basic that any investor could be expected to know it." *Ganino*, 228 F.3d at 162 (internal citations omitted). "Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Id.* As such, materiality is a mixed question of law and fact. *See id.*

### a. False statement or omission of material fact

In their motion for summary judgment, Plaintiffs contend that collateral estoppel applies to the issue of whether Defendants Charles Stiefel and SLI made a false statement or omission of material fact by failing to disclose the merger/sale negotiations to Plaintiffs in light of the following: "(A) the issue is identical to the *Finnerty* Case; and (B) the issue was necessary to support a valid and final judgment and was actually decided in the *Finnerty* Case after Defendants' full and fair opportunity to litigate therein on the merits." Dkt. No. 81-1 at 10. Defendants, however, contend that, while there is some overlap between the facts tried in *Finnerty* and the allegations in the present matter, Plaintiffs have failed to demonstrate that the issues tried in *Finnerty* are identical to the issues in each of their individual claims. *See* Dkt. No. 100 at 17-18. Further, Defendants argue that Plaintiffs failed to carry their burden of establishing that any particular alleged misrepresentation or omission was necessarily determined in *Finnerty* in light of the multiple theories of liability presented and the fact that the jury returned a "general verdict." *Id.* at 18-21.

In *Finnerty v. Stiefel Laboratories, Inc.*, 756 F.3d 1310 (11th Cir. 2014), the plaintiff worked as a sales representative for SLI from 1986 until he was terminated on August 29, 2008,

23

along with numerous others in a reduction of force. *See Finnerty*, 756 F.3d at 1315. Although the plaintiff was entitled for his vested ESBP benefits after his termination, he initially elected to defer the distribution. *See id.* In November of 2008, the plaintiff received a letter from SLI announcing major changes to their ESBP and another letter shortly thereafter reminding him of his opportunity to take a distribution. *See id.* "Concerned about the impending changes, on January 6, 2009, Finnerty executed a form irrevocably electing to receive his distribution of SLI stock and to 'put' the stock to SLI at the then-effective fair market value of $16,469 per share. SLI completed this transaction on February 13, 2009." *Id.* The plaintiff brought suit alleging violations of, among other things, section 10(b) of the Securities Exchange Act of 1934. *See id.* at 1316. In May of 2012, the securities fraud count was tried on the theory that SLI had a duty to disclose to the plaintiff information relating to its merger negotiations with Sanofi-Aventis but failed to do so. *See id.* The jury returned a verdict in the plaintiff's favor. *See id.*

On appeal, SLI argued that the plaintiff failed to provide sufficient evidence to permit a reasonable jury to find that its merger talks with Sanofi-Aventis were material as required by Rule 10-b. *See id.* at 1321. Rejecting this argument, the Eleventh Circuit held that "SLI's discussions with Sanofi-Aventis were sufficiently advanced by January 6, 2009, when Finnerty exercised his 'put' option, for a jury to find them material. By January of 2009, Charles Stiefel had met with the chief executive officer of Sanofi-Aventis to discuss the strategic fit between the two companies, and SLI had engaged Blackstone Advisory Services to facilitate a possible sale." *Id.* Further, the court noted that "valuation analysis conducted by Blackstone Advisory Services had shown that the potential acquisition price could be in the range of 2.5 to 4.5 times revenue, which would be of considerable magnitude for SLI shareholders." *Id.* As such, the court concluded that the jury

reasonably found that knowledge of the undisclosed merger negotiations would have affected the plaintiff's decision to sell. *See id.* at 1321 n.8.

In opposition to Plaintiffs' motion for summary judgment, Defendants argue that because the jury returned a general verdict, there is no way to know whether the issues decided were "identical" to the those in dispute in the present matter. *See* Dkt. No. 100 at 17-18. For example, Defendants contend that "the *Finnerty* jury could have found that Charlie's and Bill Humphries' alleged representations to Finnerty during the 2008 national sales meeting were the basis for its finding of liability. It is undisputed that none of the Plaintiffs [in the instant case] attended this 2008 meeting or heard the statements allegedly made during this meeting." *Id.* at 18.

The Court agrees with Defendants that collateral estoppel is inappropriate in the present matter. In *Martinolich v. Stiefel Laboratories, Inc.*, No. 12-cv-24212 (S.D. Fla.), in their motion for summary judgment, the plaintiffs argued that issue preclusion or collateral estoppel should be applied to the materiality and scienter elements of their Rule 10b-5(b) claim, relying on the *Finnerty* verdict and subsequent decision on appeal. *See* Dkt. No. 102-13 at 3. Denying the plaintiffs' motion, the court found that the plaintiffs "have not shown the issues decided in *Finnerty* – presented in the disjunctive as they were on a general verdict form – are identical to those the three Plaintiffs present here on their securities fraud claim." *Id.* The court noted that the general verdict in *Finnerty* "consisted of affirmative responses to the following questions asked as to Stiefel and Charles: whether 'Defendant's conduct in connection with Plaintiff's sale of his stock to Stiefel Labs violated Rule 10b-5(b) by making a false representation of material fact, or omitting a material fact (as explained in the Court's instructions)?'" *Id.* at 5 (quotation omitted). The *Martinolich* court further noted that the *Finnerty* jury was "never asked to identify what 'false

representation of a material fact' *or* omission of a material fact, it was determining Defendants to be guilty of." *Id.*

Moreover, the court noted that the plaintiff in *Finnerty* presented to the jury the fact that the Werner Stiefel told him during his first day of training class that "'he was proud to have a family-owned company, and he planned to keep it that way[.]'" *Id.* at 6 (quotation omitted). Further, the *Martinolich* decision noted that Finnerty testified that company representatives discussed the fact that SLI was privately held "'in virtually every meeting, every national meeting when we had the whole sales force there.'" *Id.* (quotation omitted). Although the court acknowledged that there were many similarities between the two cases, the court nevertheless denied summary judgment because "[n]ot all of the present Plaintiffs heard or read the same information as the others, nor did they hear or read the same information Finnerty did. Similarity in the general culture of the company and its statements over time and in different settings of its intention to remain privately held do not translate into a finding, at summary judgment, that the issue or issues decided by the *Finnerty* jury are identical to those presented here. . . . As Defendants emphasize, it may have been representations made to Finnerty at a 2008 national sales meeting that formed the basis of the jury's finding of liability; it is not clear which, if any of the present Plaintiffs attended that meeting or heard those statements." *Id.* at 8-9 (internal citations omitted).

As the Court found in *Martinolich*, while there are considerable similarities between the facts and issues in dispute in *Finnerty* and the present matter, it is clear that not all of the present Plaintiffs were privy to the same information as the others, nor were they privy to all of the information as the plaintiff in *Finnerty*. Moreover, Plaintiffs are asking the Court to distill special findings from the general verdict in *Finnerty* concerning whether it was material

26

misrepresentations, omissions, or both that form the basis for the jury's affirmative responses to the materiality and scienter questions on the verdict form. *See* Dkt. No. 102-13 at 8.

In *Finnerty*, the jury was instructed as to what constitutes actionable misrepresentations and omissions for purposes of the plaintiff's Rule 10b-5(b) claims. The instructions did not limit the jury's consideration of the evidence to any specific theory of liability. Instead, the jury was instructed that it was required to determine whether the defendants' "conduct in connection with [Finnerty's] sale of his stock to Stiefel Labs violated Rule 10b-5(b) by making a false representation of material fact or omitting a material fact." Dkt. No. 101 at ¶ 135. Following deliberations, the *Finnerty* jury returned a general verdict against the defendants that did not contain any specific findings as to whether the verdict was based on a misrepresentation or omission, much less which one(s). *See id.* Since there is no basis for ascertaining which, if any, of the facts upon which Plaintiffs' rely were in fact found by the *Finnerty* jury to support the verdict, they are not entitled to summary judgment on this ground.

In *Dodge v. Cotter Corp.*, 203 F.3d 1190 (10th Cir. 2000), the district court tried a bellwether case involving eight plaintiffs, which resulted in a general verdict finding the defendant negligent. *See id.* at 1194-95. The next group of plaintiffs sought summary judgment on the ground that the defendant was collaterally estopped from relitigating the issues decided in the first trial. *See id.* at 1196. The district court agreed and ruled that the defendant's negligence "had been decided and would not be relitigated." *Id.* at 1197. Reversing the district court, the Tenth Circuit looked to the jury instructions as the "blueprint for determining the parameters of the first jury's verdict," and held that the instructions "sabotage[d] the existence" of the first collateral estoppel element, *i.e.*, that the issue sought to be precluded was actually decided in the

first trial. *See id.* at 1198. Considering the jury instructions and the verdict form, the court explained that the

> complaint contained eleven specific allegations of negligence,
> providing detail to the preceding three paragraphs alleging Cotter's
> duty, breach of the duty, and "negligent acts and/or omissions of the
> Defendants, including but not limited to" the catalog of specific
> negligent acts. Nonetheless, the first jury was simply instructed, in
> part, "negligence means a failure to do an act which a reasonably
> careful person or company would do. . . ." The jury was not
> instructed on the specific duty allegedly breached. Nor did the
> verdict form specify what negligent act formed the basis of the
> general finding of negligence. . . .
>
> Nonetheless, our concern is not that the jury did not find negligence
> on one or more specific allegations, but that the general finding
> under the negligence instruction fails to identify what the jury found
> sustained by the evidence. Thus, we cannot say as a matter of law
> the issue decided by the first jury is identical to the issue in
> controversy in this case. To attempt to cure that defect by labeling
> the first trial a "bellwether," or citing the pretrial order is to no avail.
> The . . . jury's verdict does not assure an unassailable finding that
> plaintiffs met their burden of proof that [the defendant] breached a
> specific duty.

*Id.* at 1198-99 (footnote omitted).

In the present matter, as in *Dodge*, the *Finnerty* jury was instructed that Defendants could be liable to the plaintiff if they found that the defendants made a number of alleged material misrepresentation(s) or omission(s) of fact in connection with the stock transaction. *See* Dkt. No. 101 at ¶¶ 134-135. The *Finnerty* jury was not instructed on the specific misrepresentations or omissions allegedly made by the defendants and made no specific finding as to which alleged misrepresentation(s) or omission(s) formed the basis of its verdict.

Based on the foregoing, the Court denies this portion of Plaintiffs' motion for summary judgment.

### b. Scienter

In this motion, Plaintiffs argue that they are entitled to summary judgment on the issue of whether Defendants knowingly failed to update them regarding the ongoing merger/sale negotiations. *See* Dkt. No. 81-1 at 22-24.

As noted, the general verdict form and evidence presented in the *Friedman* case do not permit the Court to determine which alleged misrepresentation(s) or omission(s) the jury found to be material. Similarly, the Court is unable to determine which misrepresentation(s) or omission(s) of fact the jury found to have been done knowingly. Accordingly, Plaintiffs' motion for summary judgment on this ground is denied.

### c. Justifiable reliance

In their motion, Plaintiffs argue that they are entitled to summary judgment on the issue of whether they justifiably relied on Defendants' false representations of material fact when electing to "put" their shares to SLI. *See* Dkt. No. 81-1 at 24-26. Having denied Plaintiffs' motion as to the false statement or omission element of their claim, it would be inappropriate to grant Plaintiffs' motion as to the justifiable reliance element. Accordingly, the Court denies this portion of Plaintiffs' motion for summary judgment.

### 4. Duty to disclose the potential sale as of January of 2009 or abstain from purchasing

In their motion, Plaintiffs contend that, in addition to their entitlement to summary judgment on the grounds of collateral estoppel, Plaintiffs are also entitled to partial summary judgment on Defendants' duty to disclose the potential sale of SLI at the time of Plaintiffs' put elections in January of 2009 or, at a minimum, abstain from purchasing Plaintiffs' ESBP shares. *See* Dkt. No. 81-1 at 26-29. Defendants, however, argue that the Court should deny this request because "(1) it requires a finding that information relating to Project Jump was material at the time of Plaintiffs' January 2009 put elections and Plaintiffs cannot establish that there are no

genuine issues of material fact as to the materiality of this information; and (2) it improperly relies on the insider trading 'disclose or abstain' rule, which is inapplicable to Plaintiffs' Rule 10b-5(b) claims, which are the only remaining claims Plaintiffs have asserted against Defendants." Dkt. No. 100 at 23. In their reply, Plaintiffs contend that Defendants mistakenly assert that Plaintiffs claims arise only under Rule 10b-5(b) when, in fact, their complaint asserts claims under all three subparagraphs of Rule 10b-5. *See* Dkt. No. 110 at 12. Further, Plaintiffs argue that "even if this Court should find that Plaintiffs' Complaint does not assert a claim under all three subparagraphs of 10b-5 – which it does – the 'disclose or abstain' rule is applicable to the claims asserted herein as held by the Second Circuit." *Id.* (citation omitted). Finally, Plaintiffs assert that "Defendants' argument that any insider trading claim would fail as a matter of law because Plaintiffs cannot establish[ ] that Charles Stiefel purchased [P]laintiffs' stock or SLI avoided any loss or gained any profit is misplaced." *Id.* at 13.

### a. Plaintiffs' Rule 10b-5 claim

Defendants contend that Plaintiffs' motion must be denied because the "disclose or abstain" rule is inapplicable to Plaintiffs' Rule 10b-5(b) claim, and Plaintiffs have not alleged an insider trading claim under the other subsections of Rule 10b-5. *See* Dkt. No. 100 at 27-29. The Court disagrees.

In *Martinolich v. Stiefel Laboratories, Inc.*, No. 12-cv-24212 (S.D. Fla.), the defendants argued in their motion for summary judgment that "where the premise of a Rule 10b-5 securities law claim consists of alleged misrepresentations and/or omissions, as here, it must be raised under Rule 10b-5(b). . . ." Dkt. No. 110-4 at 10. As such, the defendants argued that they were entitled to summary judgment on the plaintiffs' Rule 10b-5(a) and Rule 10b-5(c) claims. *See id.* The plaintiffs responded that the defendants' motion "'rests on the inaccurate premise that Plaintiffs'

30

claims are based entirely on Defendants' omissions, ignoring the fact that Plaintiffs' claims are also based on Defendants' misconduct in repurchasing Plaintiffs' shares based on material, non-public information, *i.e.*, Defendants' insider-trading.'" *Id.* at 10-11.

Rejecting the defendants' arguments, the court first found that the plaintiffs adequately alleged claims arising under all three subparagraphs of Rule 10b-5. *See id.* at 12. In their complaint, the plaintiffs set forth the following allegations, which tracked the language of all three subparagraphs of Rule 10b-5:

> The Company and Charles Stiefel each: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Plaintiff [sic] in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

*Id.* The *Martinolich* court found this sufficient to set forth claims pursuant to all three subparagraphs of Rule 10b-5.

In the present matter, in Count One of their complaint, Plaintiffs alleged as follows:

> Defendant, Stiefel Labs and Defendant, Charles Stiefel, each: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Plaintiffs in an effort to maintain artificially low prices for Stiefel Labs' securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

Dkt. No. 1 at ¶ 128. This language, which is nearly identical to the language set forth in the *Martinolich* amended complaint, is sufficient to set forth claims under all three subparagraphs of Rule 10b-5.

Defendants further argue that any insider trading claim is subject to dismissal because Plaintiffs "cannot establish that (1) Charlie purchased Plaintiffs' stock (or anyone else's stock), which would require the dismissal of any such claim against him . . .; or (2) SLI avoided any 'loss' or gained any 'profit' as a result of Plaintiffs' stock transactions, which would require dismissal of any such claim against it, because the stock acquired from Plaintiffs was cancelled and converted into treasury shares and these treasury shares were subsequently cancelled without the payment of any consideration to SLI in connection with the GSK merger." Dkt. No. 100 at 29. Contrary to Defendants' contentions, Plaintiffs have plausibly alleged these facts and supported these allegations with admissible evidence. First, Defendant Charles Stiefel is "sued as a person in control of the Company under Section 20(a) of the Exchange Act." Dkt. No. 1 at ¶ 126. Plaintiffs also allege various ways in which Defendant Charles Stiefel caused the alleged improper conduct to occur. *See, e.g.,* Dkt. No. 1 at ¶ 143. Under 15 U.S.C. § 78t(a), "controlling persons" are jointly and severally liable as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Defendants do not point to any relevant authority indicating that Defendant Charles Stiefel, who was the Company's President, Chairman and CEO during the relevant time period, does not fit within the "broad" definition that the Second Circuit has applied to this term. *See S.E.C. v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975) ("Control was defined in a broad fashion . . . to reach prospective wrongdoers, rather than to permit the escape of those who would otherwise be responsible for the acts of their employees"); *see also Poptech,*

*L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 336 (D. Conn. 2011) ("'Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons'") (quotation omitted).

As to Defendants' second argument, Plaintiffs allege that Defendants repeatedly concealed material information concerning the fair market value of the stock and "increased their efforts to reduce outstanding shares beginning in 2008 by terminating employees and offering remaining ESOP participants, including Plaintiffs, the 'optional diversification opportunity' to sell their shares to the Company at the artificially low 2008 Bogush Valuation." Dkt. No. 1 at ¶¶ 129-131. Further, Plaintiffs allege that the percentage and value of SLI's stock owned by Defendant "Charles Stiefel, his family and entities that he controls, increased significantly as a result of the repurchase of shares of Company stock from the ESOP participants including, but not limited to, Plaintiffs." *Id.* at ¶ 143. In fact, "[o]n February 20, 2009, Brent Stiefel calculated and sent to Todd Stiefel and Charles Stiefel a third version of the payout schedule showing the difference between what Charles, Todd and Brent Stiefel as well as Todd and Brent Stiefel's children [would] receive pre-ESBP buyback and post-ESBP buyback on a spreadsheet with a per share price of $68,000 . . . Brent Stiefel stated, 'It is nice to see the $ go up for all of us!'" Dkt. No. 85 at ¶ 98 (citations omitted); *see also* Dkt. No. 94, Exs. 132-132A.

Based on the foregoing, the Court finds Defendants' arguments entirely without merit.

### b. Defendants' duty to disclose material, nonpublic information or abstain

Plaintiffs move for partial summary judgment on Defendants' duty to disclose material, nonpublic information. *See* Dkt. No. 81-1 at 26-29. Specifically, Plaintiffs contend that they are entitled to "partial summary judgment on the duty of Defendants, Charles and Stiefel Labs, to

disclose the potential sale of SLI when Plaintiffs' ESBP 'put' elections in January of 2009 or, at a minimum, abstain from purchasing Plaintiffs' ESBP shares." *Id.* at 26.

"[W]here the issue is whether an individual's relationship to information imposed upon him a duty to disclose, the inquiry as to his duty is quite distinct from the inquiry as to the information's materiality." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (citing *Dirks v. S.E.C.*, 463 U.S. 646, 103 S. Ct. 3255, 77 L. Ed. 2d 911 (1983)). "On the other hand, where the disclosure duty arises from the combination of a prior statement and a subsequent event, which, if not disclosed, renders the prior statement false or misleading, the inquiries as to duty and materiality coalesce. The undisclosed information is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.'" *Id.* at 267-68 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001).

The question posed by Plaintiffs' motion would require the Court to decide an issue of law entirely independent of the question of materiality, which is undeniably a disputed issue of material fact, as well as an issue on which the very duty to disclose or abstain depends. The Court declines to decide this issue of law in a vacuum on summary judgment. Rather, the question of SLI's duty to disclose or abstain will be addressed as it relates to the instructions to be given to the jury.

Accordingly, the Court denies Plaintiffs' motion for partial summary judgment.

**B.    Plaintiffs' *Daubert* motion to exclude expert testimony**[6]

In their motion, Plaintiffs seek to preclude the expert witness testimony of Lance T. Studdard and Chester A. Gougis.  *See* Dkt. No. 86-1.  First, Plaintiffs argue that the testimony of each expert witness is precluded "as violative of the scope and intent of the 'Stipulation by the Parties and Counsel to Streamline the Issues and Claims' entered into between the parties in this action on January 12, 2015[.]" *Id.* at 1.  Further, Plaintiffs contend that Studdard and Gougis are not qualified to testify in this securities fraud case.  *See id.*  Next, Plaintiffs argue that Defendants cannot establish that either Mr. Studdard or Mr. Gougis are qualified to be experts in this case, nor can they establish that the opinions that they intend to offer are based upon reliable data and methodology, or that their opinions will assist the trier of fact to decide any disputed issues in this securities fraud case.  *See id.* at 1-2.  Finally, Plaintiffs contend that "a careful reading of Mr. Studdard's Report reveals that he does not set forth a single industry standard upon which he bases or supports his opinions.  Instead, he simply generically refers to 'industry customs and standards' without providing detail or support for such statements." *Id.* at 2.  As such, Plaintiffs claim that Mr. Studdard's opinions "are nothing more than legal conclusions that directly conflict with [the] Eleventh Circuit's decision in *Finnerty v. Stiefel Laboratories, Inc.*, 765 F.3d 1310 (11th Cir. 2014), . . . which he obstinately refuses to accept." *Id.*

### *1. Standard*

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  That Rule provides as follows:

_____

[6] The Court notes that the plaintiffs in several of the other related actions pending in Florida and Georgia made substantially similar motions to exclude the testimony of Defendants' expert witnesses, which were denied.  *See, e.g.*, *Fried v. Stiefel Laboratories, Inc.*, No. 11-cv-20853, Dkt. No. 114 (S.D. Fla.).

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)). The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools

for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

### 2. Chester A. Gougis

Mr. Gougis obtained his bachelors degree in economics from Harvard University in 1974 and a master's degree in business administration from the University of Chicago in 1976. *See* Dkt. No. 91-6 at ¶ 3. He has over thirty-five years of experience in the financial services industry, focused on providing valuation and other financial advisory services to public and privately owned companies. *See id.* at ¶ 2. Since 2006, Mr. Gougis has been the Managing Partner of Cognitive Capital Partners, a private equity investment firm. *See id.* at ¶ 4. Moreover, since 2009, he has been the President and Chief Executive Officer of Cognient Group, LLC, a valuation and financial advisory consulting firm. *See id.* Prior to founding Cognitive Capital Partners and Cognient Group, he was employed for twenty-eight years by Duff & Phelps, an investment

banking firm that specializes in providing merger and acquisition, valuation, and financial opinion services. *See id.* at ¶ 5. During this time, he was "personally involved in performing hundreds of stock valuations involving ESOPs and employee stock bonus plans[.]" *Id.*

In his report, Mr. Gougis explains a number of stock valuation concepts, which Defendants claim will help the jury in understanding Plaintiffs' claim that "Bogush's valuations relied on improper methods and were known by Defendants to be too low." *Id.* at ¶¶ 27-51; *see also* Dkt. No. 103 at 9. Mr. Gougis also discusses why Plaintiffs' "attempts to rely on both the convertible preferred stock investment proposals and the GSK merger price to establish the fair market value of the ESBP stock is invalid and contrary to accepted valuation principles." Dkt. No. 103 at 9. Moreover, Mr. Gougis discusses a number of factors that Plaintiffs ignore, which he claims undermines Plaintiffs' argument that a merger with GSK was a foregone conclusion as early as November 26, 2008. *See* Dkt. No. 91-6 at ¶ 58. According to Mr. Gougis, the following factors make it speculative in January and February of 2009 that SLI would find any buyer willing to acquire it, much less at a price approaching GSK's ultimate purchase price: (1) the worsening economic condition in the United States and worldwide in late 2008 and early 2009; (2) SLI's own deteriorating financial performance; (3) Blackstone's ownership of the convertible preferred stock; (4) the fact that SLI was still primarily a family-owned business; and (5) Project Jump was still in its infancy when Plaintiffs exercised their stock distribution and put rights. *See id.* at ¶¶ 59-67.

### 3. Lance Studdard

Mr. Studdard received his bachelors degree and juris doctor from the University of Alabama and his Accredited Investment Fiduciary Designation from the Center for Fiduciary Studies at the University of Pittsburgh. *See* Dkt. No. 91-7 at 2-3. Mr. Studdard has over fifteen years of experience as a professional fiduciary providing trustee and other fiduciary services to

employee retirement benefit plans governed by ERISA, including ESOPs. *See id.* at 2. He is currently a Senior Vice President at Benefit Trust Company, an independent trust company that provides fiduciary and investment services to ESOPs. *See id.* Prior to that, Mr. Studdard worked at Reliance Trust Company, where he was responsible for making fiduciary decisions for clients, including ESOPs, providing advice to clients who served as inside fiduciaries, determining best practices, following industry standards, and writing compliance policies. *See id.* at 2-3. Before Reliance, Mr. Studdard worked for Insperity Retirement Service, where he built the policies and practices to ensure that Insperity was following industry standards and best practices for approximately 2,000 ERISA-governed benefit plans for which Mr. Studdard also served as an inside fiduciary. *See id.* at 3.

During the last decade, Mr. Studdard has provided fiduciary services to over 100 ERISA-governed retirement benefit plans, including ESOPs. He has been involved in fiduciary decision making on behalf of institutional trustees in more than seventy transactions involving ESOP-owned companies, including over a dozen where Mr. Studdard personally functioned as the trustee for an ESOP whose corporate plan sponsor was sold. *See id.*

According to Defendants, "Plaintiffs have recently tried to inject into this case arguments that Defendants should have somehow suspended or refused to honor ESBP participants' Plan-mandated stock distribution and put rights." Dkt. No. 103 at 12. Defendants contend that, although Plaintiff should be precluded from offering such arguments and evidence, Mr. Studdard "has been identified by Defendants as an expert on ESOP industry practices and how a fiduciary would go about analyzing Plaintiffs' suggested alternatives to disclosure and the practical implications of taking one or more of those suggested alternative courses of action." *Id.* (citation omitted).

In his first, second and fourth opinions, Mr. Studdard responds to Plaintiffs' arguments as to how SLI could have refused to honor their exercised "put" rights. *See* Dkt. No. 91-7 at 16-24. In his first opinion, Mr. Studdard discusses the fact that "[i]ndustry standards dictate that fiduciaries follow and not substantially deviate from established procedures and schedules unless they determine that the failure to do so will result in a breach of fiduciary duty or other violation of law." *Id.* at 16-17. In his second opinion, Mr. Studdard concludes that, "[a]t the time of Plaintiffs' irrevocable stock put elections, and even at the time of payment on February 13, 2009, there was no information or state of events which would have suggested to a fiduciary acting in conformity with industry standards that the established procedures and schedules under which the ESBP operated should be altered or otherwise deviated from." *Id.* at 18. Finally, in his fourth opinion, Mr. Studdard opines that the Plan fiduciaries "acted consistent with industry standards by not suspending, delaying, or otherwise deferring Plan participants' rights in late 2008 and 2009." *Id.* at 21-24. Mr. Studdard claims that the imposition of a blackout period for reasons other than purely administrative purposes is extremely rare and that, "[i]n the context of a possible merger or acquisition involving the plan sponsor, a fiduciary acting in accordance with industry standards does not consider imposing a blackout period until there is an executed contract between the plan sponsor and the acquiring or selling company." *Id.* at 22.

### 4. Qualifications to provide their respective expert opinions

First, Plaintiffs contend that Defendants' proffered expert witnesses should be excluded from trial because they are not qualified to testify as experts in this case. *See* Dkt. No. 86-1 at 8-12. Plaintiffs argue that Mr. Studdard is not qualified to testify as an expert on securities fraud claims, since his sole purported area of expertise is ERISA, not securities fraud. *See id.* at 9-11. Similarly, Plaintiffs claim Mr. Gougis' opinions do not relate to or address issues present in this

securities fraud action.  *See id.* at 11-12.  According to Plaintiffs, "[a] review of the Gougis Report reveals that Mr. Gougis' education, training and work experience have been limited to the field of securities within the financial services industry and as consultant regarding company valuations to buyers and sellers in mergers and [acquisitions]. . . .  In particular, Mr. Gougis' opinions in his report focus on the March 31, 2008 valuation of the Stiefel ESBP shares." *Id.* at 11.  Since the issues related to the March 31, 2008 valuation were expressly addressed in the parties' Stipulation and because Plaintiffs have conceded that they will neither challenge the Bogush valuation, nor argue that a later valuation should have been conducted, Plaintiffs contend that Mr. Gougis' testimony is irrelevant and will not assist the jury in otherwise arriving at a commonsense determination of the facts of this case.  *See id.* at 11-12.

In the present matter, both proffered experts have relevant post-graduation education and extensive experience in their respective fields and they provide opinions that will assist the jury in understand matters at issue in this case.  Specifically, Mr. Gougis' investment banking opinions will assist the jury in understanding the process that merger negotiations go through and support Defendants' position that a merger at any price is speculative until certain milestones are reached, such as a purchase offer with price and terms specified.  Similarly, Mr. Studdard's opinions are offered to counter Plaintiffs' arguments that Defendants/the Plan fiduciaries should have deviated from the normal schedules and operations set forth in the Plan.  Further, as Defendants contend, these opinions will aid the jury "in understanding that Plaintiffs' proposed alternatives to disclosing Project Jump are actually more harmful than disclosure, which Plaintiffs concede would likely have killed any merger discussions." Dkt. No. 103 at 8.  Mr. Studdard's opinions are relevant to the scienter and causation elements of Plaintiffs' Rule 10b-5(b) claim.

### 5. *The expert opinions are supported and reliable*

Although Plaintiffs do not contend that Mr. Gougis' opinions are not reliably based on well-established and widely accepted principles, they argue that Mr. Studdard failed to "explain how [his] experience supports and leads to the conclusion he reaches." Dkt. No. 86-1 at 17. Contrary to Plaintiffs' assertions, Mr. Studdard did connect his training and experience as an ESOP fiduciary with his testimony about the standards of the ESOP industry and how ESOP fiduciaries actually act. For example, in response to Plaintiffs' suggestion that a blackout period could have been imposed in January or February of 2009, Mr. Studdard notes that such an action would have almost certainly led to the disclosure of Project Jump and that, in the more than seventy transactions he has been apart of involving ESOP-owned companies, he has never seen a blackout period used in the way Plaintiffs suggest it should have been used. *See* Dkt. No. 91-7 at 22. Further, Mr. Studdard explained that he has "provided fiduciary services in dozens of situations in which a company plan sponsor was considering a potential merger, acquisition, or sale of some or all of the plan sponsor's assets." *Id.* at 19. Mr. Studdard explained that, in his experience, "a professional fiduciary is not normally advised of a contingent corporate event until such time as the company's shareholders are advised of the event." *Id.* As Defendants correctly contend, this type of experience, explicitly connected to the opinions being offered, is sufficient grounds for the admission of Mr. Studdard's opinions. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010).

Plaintiffs also contend that Mr. Studdard's testimony should be excluded because he "fails to cite to a single document, rule, code, manual, text, treatise or regulation from any governing body, association or national group that provides a basis or support for his assertions regarding the 'industry standards' for ERISA plans." Dkt. No. 86-1 at 16. The Court finds Plaintiffs' arguments unpersuasive. The Advisory Committee Notes to Rule 702 provide as follows: "Nothing in this

amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Even if Mr. Studdard's extensive education, training, and experience were insufficient to support his opinions, during his deposition Mr. Studdard identified publications from both the National Center for Employee Ownership and the ESOP Association in support of his opinions in this case.  *See* Dkt. No. 104-2 at 82-83, 90-92, 97.

Accordingly, the Court denies Plaintiffs' motion on this ground.

### 6. Relevance and helpfulness to the jury

#### a. Mr. Studdard

As to Mr. Studdard, Plaintiffs contend that Mr. Studdard should not be permitted to opine "that ERISA-based fiduciary standards are even relevant to Defendants' decision to not abstain from purchasing Plaintiffs' stock[.]"  Dkt. No. 86-1 at 21.  Plaintiffs argue that the jury will not be charged on ERISA, and the jury will not be asked to make any findings of ERISA violations.  *See id.* at 20.  Rather, Plaintiffs contend that the jury will be charged on the elements of securities fraud and introducing ERISA industry standards into the case will do nothing but "confuse and perplex the jury."  *Id.* at 20-21.  Defendants, however, contend that Mr. Studdard's opinions are directly relevant to Plaintiffs' more recent assertions "that various alternatives existed to following the terms of the Plan and honoring Plaintiffs' stock put rights."  Dkt. No. 103 at 23.  According to Defendants, "[t]hose suggestions necessarily implicate the ESBP fiduciaries as they involve (1) violating the terms of the ESBP, (2) possibly causing a Plan disqualification or other legal issue for which the fiduciaries would be liable, and (3) the practicalities of ESOP administration

Studdard merely explains how fiduciaries in the ESOP industry evaluate these kinds of suggested courses of action, and concludes that none of Plaintiffs' proposed alternatives is practical." *Id.* (citation omitted). Moreover, Defendants contend that Mr. Studdard's opinions on Defendants' compliance with ESOP industry standards is relevant to the scienter element of Plaintiffs' securities fraud claim. *See id.* at 23-24.

In the present matter, the Court agrees with Defendants that Mr. Studdard's testimony is relevant to the extent that Plaintiffs intend to present evidence and testimony as to alternative actions Defendants could have taken. This testimony will help the jury in evaluating the feasibility and practicality of these proposed alternatives. Further, although proof that Defendants failed to comply with industry standards would be insufficient, by itself, to "constitute strong circumstantial evidence of conscious misbehavior or recklessness," *In re JP Morgan Auction Rate Sec. (ARS) Marketing Litig.*, 867 F. Supp. 2d 407, 424-25 (S.D.N.Y. 2012) (citations omitted), such evidence is nonetheless relevant to establishing the requisite scienter, when considered in the context of Defendants' other alleged actions and statements. *See S.E.C. v. Sky Way Global, LLC*, No. 8:09-cv-455, 2010 WL 5058509, *4 (M.D. Fla. Dec. 6, 2010) (citations omitted).

Moreover, in a securities fraud case, the plaintiff may establish scienter by either "(1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Iowa Public Employee's Retirement System v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) (quotation and other citation omitted). When a plaintiff seeks to establish scienter through conscious misbehavior or recklessness, the alleged reckless conduct must be behavior that is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or

45

so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Kalnit*, 264 F.3d at 142) (other quotations omitted). "In the case of securities fraud, the Second Circuit has noted on multiple occasions that plaintiffs' allegations 'suffice[ ] to state a claim based on recklessness when they . . . specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quotation and other citation omitted).

In the present matter, Plaintiffs seek to establish the scienter requirement through both Defendants' motive and opportunity, as well as through their alleged recklessness. Testimony regarding industry practices and the relevant standards of ordinary care is undoubtedly relevant to Defendants' contentions that they acted in an objectively reasonable manner. It is important to note that Defendants claim that they are not using Mr. Studdard's opinions to support an argument that compliance with ESOP industry standards is a "shield" to liability under the securities laws. *See* Dkt. No. 103 at 23. Rather, Defendants' position is simply that compliance with these industry standards is relevant to the scienter element of Plaintiffs' securities fraud claim. *See id.* at 23-24. As discussed, the Court agrees that such opinion testimony is relevant and will be helpful to the jury.

Accordingly, Plaintiffs' motion to preclude on this ground is denied as to Mr. Studdard's testimony.

### b. Mr. Gougis

Plaintiffs contend that the jury in this case will only be asked to decide the issue of liability in this securities fraud case since the parties have fixed any damages through stipulation. *See* Dkt. No. 97 at 23. Further, Plaintiffs assert that, with respect to the March 31, 2008 Bogush valuation, they "will neither challenge the Bogush valuation, nor argue that a later valuation should have been conducted." *Id.* Therefore, since two of the three opinions proffered by Mr. Gougis relate to

valuation, the opinions are now moot. *See id.* With respect to the second opinion, Plaintiffs claim

that Mr. Gougis "speculates that 'a fiduciary would not have had any reason to find the Bogush

valuation conclusions to be unreasonable'" and opines that "'a fiduciary would reasonably have

relied on these valuations as an indicator that valuation conclusions reached by Bogush were

reasonable.'" *Id.* Plaintiffs contend that this "testimony would likewise be both confusing to the

jury, and usurp their unique role as the fact finder in a trial of this matter. In essence, Gougis is

proffering an opinion solely to attempt to bolster Charles Stiefel's decision to accept the lower

Bogush valuation at face value." *Id.* at 23-24.

Defendants contend that, in the stipulation, "the parties agreed not to submit expert

opinions on the ***proper measure of damages*** for Plaintiffs' Rule 10b-5(b) claims, and Plaintiffs

agreed not to argue that any Defendant should have caused a valuation of the ESBP stock at any

time after March 31, 2008." Dkt. No. 103 at 21 (emphasis in original). As such, Defendants

argue that, "[c]ontrary to Plaintiffs' assertion, . . . . this does not resolve every valuation issue in

the case or render Gougis's opinions irrelevant." *Id.* For example, Defendants argue that

Plaintiffs have not "stipulated that Bogush's valuations were the 'correct' fair market value for the

ESBP stock." *Id.* Further, Defendants contend that "Gougis's opinions are relevant to [the

securities fraud] claim, as he explains the valuation concepts necessary for the jury to understand

and evaluate Bogush's valuations, the reasonableness of Defendants' conduct with regard to those

valuations, and Plaintiffs' argument that Defendants committed securities fraud when SLI

purchased Plaintiffs' stock based on the March 31, 2008 Bogush valuation." *Id.* As such, they

claim that Mr. Gougis' opinions are relevant to the issue of scienter. *See id.* Additionally,

Defendants assert that Mr. Gougis' opinions are relevant to the issue of scienter, as Plaintiffs have

alleged not only that the stock was undervalued, but that Defendants knew that it was undervalued. *See id.*

Contrary to Defendants' arguments, the Court finds that Mr. Gougis' expert report and testimony is irrelevant to the remaining issues in this case. The opinions in Mr. Gougis' report and testimony focus almost exclusively on the 2008 Bogush valuation of the ESBP shares. As discussed, Plaintiffs acknowledge that they "will neither challenge the Bogush valuation, nor argue that a later valuation should have been conducted." Dkt. No. 97 at 23. As to the issue of scienter, the Court fails to see how this testimony is helpful or relevant. The 2008 Bogush Valuation, which was issued on August 31, 2008, determined the value of the ESBP stock as of March 31, 2008. The evidence in the record suggests that Defendants did not actively consider selling the company until in or around November of 2008. As such, the value of the company before Defendants had seriously considered selling is inapposite.

Further, to the extent that Defendants contend that Mr. Gougis' testimony/report are necessary to explain the difference between a company's enterprise value and a company's going-concern value, the Court finds the arguments unpersuasive. A careful reading of Mr. Gougis' report leads to the conclusion that he never rendered any opinion regarding the two concepts. For example, the Gougis Report contains no opinions regarding the five enterprise valuations secured by Stiefel Laboratories when it was seeking bids from private equity firms looking to invest in the company in 2006. Although he eludes to these enterprise values in his recitation of the factual background of the case, he renders no opinion related thereto. *See* Dkt. No. 91-3. Rather, the opinions relate solely to the validity, methodology and accuracy of the 2008 Bogush Valuation. *See id.*

Based on the foregoing, the Court grants Plaintiffs' motion *in limine* insofar as it seeks to preclude the report and testimony of Mr. Gougis.[7]

### 7. Legal conclusions

Federal Rule of Evidence 704(a) specifically permits an expert to proffer testimony that "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "Indeed, 'if a witness (especially an expert) provides a solid foundation and explanation on an issue for which the factfinder needs assistance, the factfinder might be left hanging if the witness cannot cap off the testimony with a conclusion about the ultimate issue to which the expert is testifying.'" *Krys v. Aaron*, 112 F. Supp. 3d 181, 192 (D.N.J. 2015) (quoting 3 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 704.02[1] (9th ed. 2006)). In fact, "testimony that amounts to 'less than a full narrative . . . is like the joke without the punchline, the mystery without the last page,' particularly with respect to experts, where 'a conclusion on the ultimate issue often ties the witness' testimony together into a coherent whole.'" *Id.* (quotation omitted). "Nevertheless, the ultimate issue rule does not enable an expert to 'merely tell the jury what result to reach.'" *Id.* (quoting Fed. R. Evid. 704 advisory committee's notes (1972)). Thus, an expert may not render any ultimate opinion concerning, for example, whether a specific party had "'capacity to make a will,'" but may offer an opinion concerning whether that party had "'sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution.'" *Id.* (quotation and other citation

---

[7] At the time of trial, if Defendants believe that Mr. Gougis' testimony has become relevant because of the testimony or evidence presented, the Court will entertain arguments as to reconsideration of this ruling.

omitted).  In other words, under Rule 704, an expert may not make a conclusory statement on a party's capacity, but may provide testimony that touches the underlying issues relevant to a determination of capacity.

Plaintiffs argue that Mr. Studdard's opinions are impermissible legal conclusions.  *See* Dkt. No. 86-1 at 17-18.  Specifically, Plaintiffs contend that "the only authorities Mr. Studdard cites in his report for the so-called 'industry standards' that he claims to apply, are the ERISA statute and its associated regulations. . . .  When an industry's standards or practices 'are coextensive with the legal constraints placed on it,' as Mr. Studdard claims the fiduciary industry's standards are, testimony about the industry's standards and practices constitutes an impermissible legal opinion." *Id.* at 17 (citing *Hamilton v. Am. Corrective Counseling Servs., Inc.*, No. 3:05-CV-434RM, 2006 WL 2873622, at *2 (N.D. Ind. Oct. 4, 2006)).  Further, Plaintiffs note that Mr. Studdard's first opinion is that industry standards dictate that fiduciaries follow established procedures and schedules "'unless they determine that the failure to do so will result in a breach of fiduciary duty or *other violation of law*." *Id.* (emphasis in original).  According to Plaintiffs, Mr. Studdard's "second, third, and fourth opinions, which claim that Defendants' conduct conformed to industry standards by not deviating from established procedures, thus necessarily opine that Defendants' conduct did not violate the law." *Id.*

In *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006), the Third Circuit Court of Appeals acknowledged that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Id.* at 218.  Nevertheless, the Court of Appeals concluded that an opinion on the issue of whether a party complied with and/or violated "legal duties" constitutes an impermissible legal opinion,

even if offered by a well-qualified expert. *See id.* at 217-18 (precluding an "experienced" former Securities and Exchange Commission attorney from offering these types of opinions).

These authorities therefore instruct that any qualified expert, including Mr. Studdard, may provide an opinion on whether a party's conduct or actions meet underlying bases for an ultimate issue in a case (by, for example, testifying whether certain acts would in the abstract be improper and/or inconsistent with a party's legal duties), but may not merely instruct the jury on the result to reach based upon a party's specific conduct or actions (by, for example, stating that a party did indeed violate an applicable duty through certain actions).[8] *See Krys*, 112 F. Supp. 3d at 193 (footnote omitted). This distinction, albeit a fine one, saves Mr. Studdard's report from being struck in its entirety. With appropriate redactions, Mr. Studdard's proposed testimony will be helpful to the jury in assessing the underlying conduct in this case. Nevertheless, the Court will exclude Mr. Studdard's report and testimony to the extent that he reaches the specific conclusion that any Defendant or person acted in compliance with and/or in violation of applicable legal duties or industry standards.

When stripped of these improper and ultimate legal conclusions, however, the Court cannot ignore that Mr. Studdard's report provides contextual information on common customs and practices in the securities industry during the relevant period. These issues remain plainly relevant and this background information may prove helpful to the jury in unpacking the intricacies of this complex litigation. *See Berckeley Inv. Grp.*, 455 F.3d at 218.

Moreover, to the extent that Mr. Studdard's report simply rehashes otherwise admissible evidence about which he has no personal knowledge, such evidence taken on its own is

---

[8] This distinction applies equally to all testimony discussed in this Memorandum-Decision and Order that will be excluded on these bases.

inadmissible. While an expert must of course rely on facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (rejecting portions of the plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent admissible, is properly presented through percipient witnesses and documentary evidence") (citation omitted); *see also Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (citations omitted). As such, Defendants are precluded from offering the background section of Mr. Studdard's report, which is simply a narrative of the facts that will be provided by other witnesses with first-hand knowledge.

Based on the foregoing, Plaintiffs' motion as to Mr. Studdard is granted in part and denied in part, without prejudice to Plaintiffs' right to voice any appropriate objections during Mr. Studdard's testimony.

## C.     Defendants' motion to exclude opinions and testimony of Plaintiffs' rebuttal expert

According to Defendants, Plaintiffs intend to proffer the rebuttal expert report and testimony of Daniel Reser to support an argument that Defendants Charles Stiefel and SLI should have either "(1) disclosed, prior to February 1, 2009, the details of 'Project Jump' to Plaintiffs and all 500-600 other participants in the SLI [ESBP]; or (2) suspended or refused to honor Plaintiffs' and other participants' stock distribution and put rights under the Plan and ERISA." Dkt. No. 89-1 at 1 (internal footnote omitted). Defendants contend that Mr. Reser's report and testimony should be excluded because "(1) the vast majority of his opinions are irrelevant to any issue remaining in this case and a number of the opinions violate the Parties' January 12, 2015 Stipulation to Streamline Issues and Claims ("Stipulation"); (2) Reser's opinions go beyond the scope of

permissible rebuttal testimony; (3) Reser is unqualified to offer many of the proffered opinions; (4) Reser's opinions largely consist of legal conclusions; and (5) Reser does not utilize any reliable methodology in reaching his conclusions." *Id.* at 1-2.

For the same reasons the Court has precluded the report and testimony of Mr. Gougis and portions of the Studdard Report, most of the Reser Report must be excluded as well. First, as with the Studdard Report, Mr. Reser's report rehashes a significant amount of background information that would be inappropriate to present to the jury. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 551 (citations omitted). Further, to the extent that Mr. Reser discusses alleged "Factual Inaccuracies, Omissions and/or Contradictions in the Studdard Report," this information is now irrelevant in light of the Court's decision to preclude the introduction of this section of the Studdard Report. *See* Dkt. No. 91-3 at 24-30.

Further, the Court finds that many of the Reser Report's opinions relate to whether the 2008 Bogush Valuation relied on proper methodologies and whether it undervalued the company. *See, e.g.*, Dkt. No. 91-3 at 33-36. As discussed, Plaintiffs have indicated that they do not intend to challenge the 2008 Bogush Valuation and the Court has granted Plaintiffs' motion *in limine* as it relates to Mr. Gougis. Accordingly, such testimony is irrelevant. With nearly all of the opinions tied to the fact that Mr. Reser believes that it was improper for Defendants to rely on the Bogush Valuation, which he deems to be premised on faulty procedures and methodologies, the opinions are entirely irrelevant and will lead to juror confusion.

Moreover, in his report, Mr. Reser offers at least a dozen opinions on how the ESBP fiduciaries violated their ERISA fiduciary duties of prudence and loyalty to Plaintiffs and other Plan participants. *See* Dkt. No. 91-3 at 30-36. Many of these opinions again relate to the fact that it was improper to rely on the Bogush Valuation. *See id.* Since the ERISA claims have been

dismissed from this action, these opinions are mostly irrelevant to the remaining causes of action and would lead to juror confusion.

The only portion of the Reser Report that the Court finds relevant is the rebuttal to the third opinion in the Studdard Report. *See* Dkt. No. 91-3 at 44-45; Dkt. No. 91-4 at 1-3. This is the only portion of the Reser Report that is not inextricably entwined with an attack on the accuracy of the Bogush Valuation and whether it was reasonable for Defendants to rely on that report. Further, this section directly rebuts the portion of the Studdard Report that the Court has found admissible. Moreover, as with the corresponding portion of the Studdard Report, this opinion goes directly to the scienter element of the securities fraud claim. However, portions of this section do still discuss perceived deficiencies with reliability and methodologies used in the Bogush Valuation. *See* Dkt. No. 91-3 at 45. As such, these statements shall be redacted from the Report.

Finally, contrary to Defendants arguments, the Court finds that Mr. Reser is qualified to testify as an expert. Mr. Reser received his juris doctor and bachelors of science from Southern Methodist University. *See* Dkt. No. 91-4 at 37. From 1981 through 1984, he worked at the Bank of the Southwest NA as a Trust Officer and Supervisor. *See id.* Thereafter, he worked for several different banks, holding various positions relating to trusts and employee benefits. *See id.* at 36-37. From 2000 through April of 2003, Mr. Reser served as Vice President of Corporate Client Services for the Wilmington Trust Company. *See id.* at 36. In this position, he was responsible for "Corporate Finance, Custody and Retirement Plan Services business development and relationship management." *Id.* Finally, from April 2003 to current day, Mr. Reser has served as President of Fiduciary Services, Inc. *See id.* In this role, he serves as an "[i]ndependent trustee or fiduciary for corporate retirement plans specializing in plans with employer stock where capital

change transaction is anticipated." *Id.* Mr. Reser's education and past experience make him

qualified to offer the opinions the Court has found admissible.

Based on the foregoing, the Court grants in part and denies in part Defendants' motion *in limine*.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the

applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment (Dkt. No. 81) is **DENIED**; and

the Court further

**ORDERS** that Plaintiffs' motion *in limine* (Dkt. No. 86) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Defendants' motion *in limine* (Dkt. No. 89) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 7, 2016
     Albany, New York

Mae A. D'Agostino
U.S. District Judge